WEST TEXAS UTILITIES CO. v. NATION-
AL LABOR RELATIONS BOARD (IN-
TERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS [A. F. L.], In-
tervenor).

No. 10465.

United States Court of Appeals
District of Columbia Circuit.

Argued May 22, 1950.

Decided July 10, 1950.

Miller, Circuit Judge, dissented.

234

Mr. Frank Cain, Dallas, Tex., of the Bar of the Supreme Court of Texas, pro hac vice, by special leave of Court, and Mr. Charles E. Rhetts, Washington, D. C., with whom Mr. Gerard D. Reilly, Washington, D. C., was on the brief, for petitioner.

. Mr. Frederick U. Reel, Washington, D. C., Attorney, National Labor Relations Board, of the Bar of the Supreme Court of Wisconsin, pro hac vice, by special leave of Court, with whom Mr. A. Norman Somers, Washington, D. C., Assistant General Counsel, National Labor Relations Board, was on the brief, for respondent. Mr. Marcel Prevost, Attorney, National Labor Relations Board, also entered appearance for respondent.

Mr. Louis Sherman, Washington, D. C., with whom Mr. Philip R. Collins, Washington, D. C., was on the brief, for intervenor.

Messrs. J. Albert Woll, James A. Glenn and Herbert S. Thatcher, all of Washington, D. C., filed a brief amicus curiae on behalf of the American Federation of Labor, urging enforcement of the order.

Before EDGERTON, WILBUR K. MILLER and BAZELON, Circuit Judges.

BAZELON, Circuit Judge.

Review is sought of a Board order requiring petitioner to cease and desist from refusing to bargain with three locals of the International Brotherhood of Electrical Workers,[1] A. F. L. These locals had been certified as the representative of a majority of the employees in an appropriate bargaining unit on August 12, 1946. During the period September 19, 1947 to October 18, 1947, petitioner refused to bargain, basing such refusal upon the expressed view of the Board's General Counsel that the officers of the American Federation of Labor [2] (with which the IBEW is affiliated) must first file non-Communist affidavits. The Board subsequently repudiated this interpretation [3] and the Company agreed to resume collective bargaining. But once again, in early November of 1947, the Company refused to bargain—this time because the locals allegedly no longer represented a majority of the employees. A charge of unfair labor practice was then filed by the locals and a complaint was issued by the General Counsel on November 12.[4] Meanwhile, on November 8, the federation officers had filed the affidavits allegedly required of them by 9(h), 29 U.S.C.A. § 159(h). The officers of the locals and of the IBEW were in compliance at all times relevant to this proceeding.

I

This case involves the construction of the non-Communist affidavit provision, § 9(h), of the Labor Management Relations Act of 1947, 29 U.S.C.A. § 159(h). That section reads:

"No investigation shall be made by the Board of any question affecting commerce concerning the representation of employees,

1. Referred to hereafter as IBEW. Petitioner is referred to as the Company.

2. Referred to hereafter as AFL or federation.

3. Matter of Northern Virginia Broadcasters, Inc., 75 N. L. R. B. 11 (1947).

4. The complaint charged unfair labor practices within the meaning of 29 U.S. C.A. § 8(a) (1) and (5).

raised by a labor organization under subsection (c) of this section, no petition under subsection (e) (1) of this section shall be entertained, and no complaint shall be issued pursuant to a charge made by a labor organization under subsection (b) of section 160 of this title, unless there is on file with the Board an affidavit executed contemporaneously or within the preceding twelve-month period by each officer of such labor organization and *the officers of any national or international labor organization of which it is an affiliate or constituent unit* that he is not a member of the Communist Party or affiliated with such party, and that he does not believe in, and is not a member of or supports any organization that believes in or teaches, the overthrow of the United States Government by force or by any illegal or unconstitutional methods." [Emphasis supplied.]

The Board held that the key phrase—"national or international labor organization" —does not ordinarily include the American Federation of Labor,[5] relying upon its prior decision in the Northern Virginia Broadcasters case.[6] That decision was based on (1) the federation's lack of participation in the collective bargaining process, (2) the policy of § 9(h), and (3) the technical meaning of "national or international labor organization" as referring to the national and international unions which are the autonomous members of the federation.

The Supreme Court has admonished us many times to give "great weight" to an agency's interpretation of its governing statute, especially where the legislative intent is ambiguous.[7] Such deference keeps the inexpertness of courts, which must deal with the whole gamut of the law, from distorting the policy of Congress in complex areas of the economy requiring specialized skills and scrutiny. It minimizes the danger that lay constructions will be given to words which are terms of art to those schooled in their special fields. The Board has drawn its conclusion that the federation is not a "national or international labor organization" from its familiarity with the terminology and the practices of the labor field. We think such a construction is consistent with both the history and the policy of 9(h). The Joint Committee on Labor-Management Relations—appointed by Congress to report upon the functioning of the new Act—appears to have been of like mind. In its annual report, the Committee analysed the Board's early decisions under the Act, specifically summarizing the Board's holding that federation officers were not ordinarily required to file affidavits. Although a number of criticisms and suggestions were made by the Committee, no objections were raised to the Board's construction of 9(h).[8]

---

5. This decision is qualified by another Board ruling, to the effect that when the federation occupies a position in relation to one of its component parts similar to that of a national or international and its locals, the federation officers must comply with § 9(h). A federation finds itself in such a position in its relations with an "organizing committee" which is directly chartered and supervised by it. Matter of American Optical Co., 81 N. L. R. B. 453 (1949).

6. Supra, note 3.

7. See, e. g., United States v. American Trucking Ass'ns, 1940, 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345; Norwegian Nitrogen Co. v. United States, 1933, 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796. ("[Administrative] practice has peculiar weight when it in-

volves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new.)"

8. The Board decision in the Matter of Northern Virginia Broadcasters, Inc., supra note 3, is summarized in the Report of Joint Committee on Labor Management Relations, Labor-Management Relations, Sen.Rep.No. 986, 80th Cong., 2d Sess., Pt. 1, p. 11; Pt. 3, pp. 36–37 (1948). See treatment of Committee approval of administrative construction as an expression of congressional acceptance in Herzog v. Parsons, U.S.App. D.C., 1950, 181 F.2d 781, 788. It is worthy of some note that Senator Taft, one of the principal sponsors of the bill, said that the Board's decision was " 'certainly not in conflict with the intention

The most authoritative discussion of 9(h) is found in the Supreme Court's recent decision in American Communications Ass'n v. Douds, 1950, 339 U.S. 382, 70 S.Ct. 674. It was held therein that the constitutional justification for a non-Communist affidavit lay in its function as a deterrent to political strikes which might seriously burden interstate commerce. The emphasis throughout the opinion was that 9(h) was aimed at those who control the collective bargaining process and hence are in a position to call political strikes. Thus, Mr. Chief Justice Vinson, speaking for the Court, pointed out that Communists might carry their revolutionary objectives "into their conduct of union affairs by calling political strikes";[9] that their beliefs "strongly indicate a will to engage in political strikes and other forms of direct action when, as officers, they direct union activities."[10] It was expected, said Mr. Justice Jackson, concurring in part and dissenting in part, that when the Communist affiliation of union officers was called to the attention of the union membership, it would no longer "entrust its bargaining power, its records, and its treasury to such [Communist] hands. When it does * * [i]ts officers cease to be interested in correcting grievances but seek to worsen and exploit them; they care less for winning strikes than that they be long, bitter and disruptive."[11] To prevent such a distortion of the Act's overriding purpose—which is the promotion of peaceful collective bargaining—Congress could "protect a labor union from Communist Party domination * * * [just as] from employer domination."[12]

Analysis of the functions performed by the various entities involved here makes it clear that it is the locals and their parent nationals or internationals who calls strikes and who participate in the collective bargaining process.[13] It is the officers of these organizations who are amenable to the pressure of the union membership via the election machinery.[14] In contrast, neither the federation nor its officers, as such, have authority to call strikes; they do not participate in collective bargaining and have no individual members who can subject them to the pressure of the ballot, for

9. of Congress' (New York Times, Oct. 8, 1947, p. 6)." Board's Brief, p. 22 n. 11.

9. 339 U.S. at 407, 70 S.Ct. at page 688.

10. Ibid.

11. 339 U.S. at 431, 70 S.Ct. at page 700.

12. 339 U.S. at 433, 70 S.Ct. at page 701. Mr. Justice Frankfurter separately stated the problem as whether or not Congress could "keep Communists out of controlling positions in labor unions as a condition to utilizing the opportunities afforded by the National Labor Relations Act, as amended by the Labor Management Relations Act, 1947." 339 U.S. at 416, 20 S.Ct. at page 693. He concluded that it was permissible for Congress to decide that "trade unions which are guided by officers who are committed by ties of membership to the Communist Party must forego the advantages of the Labor Management Relations Act * * * ." 339 U.S. at 418, 70 S.Ct. at page 694.

13. According to the Board's brief, p. 16: "Article XVII, Section 7 of the Constitution of the International Brotherhood of Electrical Workers (1947 ed.), the International union with which the charging party before the Board in these proceedings is affiliated, provides that all agreements made by a local union must be approved by the International's President, and that if necessary he may make such corrections as are required to conform to the International's policy. The control thus vested in the International extends as well to any by-law or rule of the local, or jurisdictional controversy to which the local may be a party. Article IX, Sections 6 and 7, empowers the International's Executive Council to suspend or revoke the local's charter, or to take charge of its affairs when it is deemed 'necessary to protect or advance the interests of its members and the IBEW;' and Article XVII, Section 13, requires that strikes may be called by a local only after approval by the International's president."

14. See Mr. Justice Black's dissenting opinion in the American Communications Assn. case, where he describes 9(h) as a law which coerces "union members not to elect any Communist as an officer." 339 U.S. at 450, 70 S.Ct. at page 709.

their only members are unions.[15] The position of the federation is not markedly different from that of a trade association made up of individual employers. Like the latter, it seeks to coordinate policy, provide encouragement, and perform certain staff functions such as research and publicity. Like the latter, it can hardly be described as a participant in or as in control of the collective bargaining process. This view is strongly supported by the Board's conclusion, drawn from the writings of labor economists, that the phrase in question has a distinct technical meaning which does not include federations. As one writer describes it, the national or international unions "are powerful, sovereign bodies, creating locals by charter at will, and revoking them likewise, reserving the power to suspend or otherwise discipline locals, calling strikes, and bargaining. *They are the independent groups of which the American Federation of Labor is but a confederation or alliance*." [16] [Emphasis supplied.]

The definition of labor organization, which is the same in the new as in the old Act, reflects this concern with collective bargaining and the organizations involved therein. It reads:

"The term 'labor organization' means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." 29 U.S.C.A. § 152(5).

As we have already indicated, employees do not participate in the federation, its only members being unions. Nor does the federation deal "with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." All such functions are performed by the national or international unions and their locals, except in the rare instances when the federation itself is functionally classed as a national or international.[17]

Two other factors tend to support our view that federations are not within 9(h). First, the House bill which was the forerunner of 9(h) forbade certification of any labor organization as a collective bargaining representative "if one or more of *its national or international officers*" were Communists.[18] The words italicized by us

---

15. The objectives of the American Federation of Labor, as stated in Article II of its Constitution, are primarily:
"Sec. 2. The establishment of National and International Trade Unions, based upon a strict recognition of the autonomy of each trade, and the promotion and advancement of such bodies.
\* \* \* \* \*
"Sec. 4. An American Federation of all National and International Trade Unions, to aid and assist each other; to aid and encourage the sale of union label goods, and to secure legislation in the interest of the working people, and influence public opinion, by peaceful and legal methods, in favor of organized labor."
But see note 5, supra.

16. Taylor, Labor Problems and Labor Law 269–270 (1950). "The national unions are not members of the AFL or CIO in the sense that Minnesota is a part of the United States. Their position is similar to that of individual countries within the United Nations. The AFL or CIO executive council corresponds roughly to the United Nations Security Council. Each major union has a veto power and can prevent any action adverse to its interests. It is a serious problem for the labor federations, as it is for the United Nations to find useful activities which will not break up the organization by causing internal strife among the members." Reynolds, Labor Economics and Labor Relations 143 (1949). See also Peterson, American Labor Unions 41–42 (1945).

17. See note 5, supra.

18. Section 9(f) (6) of H.R. 3020, 80th Cong., 1st Sess., read, in pertinent part, "No labor organization shall be certified as the representative of the employees if one or more of its national or international officers, or one or more of the officers of the organization designated on the ballot taken under subsection (d), is a member of the Communist Party \* \* \* ." 1 Legislative History of the Labor Management Relations Act, 1947, p. 63 (1948).

would seem to indicate that the bill was aimed at the local union and at "its national or international officers"—not at the federation of which a national or international union is a virtually autonomous part.[19] This language remained in the bill as it first passed both House and Senate [20] and was changed to its present form only when the non-Communist requirement was recast so as to provide for affidavits. It does not appear that any change in meaning was intended by the substitution of "such national or international labor organization" for "its national or international officers." Second, in his veto message, the President said, "The mere refusal by a single individual to sign the required affidavit would prevent an *entire national labor union* from being certified * * *. *The union and the affected industry* would be disrupted for perhaps a long period of time * * *." [21] It seems to us that, had it been thought that 9(h) required federation officers to file, the President would undoubtedly have pointed out the calamitous effect on the entire economy of non-compliance by a single federation officer. Not one but many industries and many "national labor unions" would then be affected by his failure to file.[22]

All that we have said thus far reveals that Congress, the President and the Supreme Court apparently considered "national or international labor organization" to mean those organizations which directly perform the collective bargaining functions described in § 2(5).[23]

Petitioner argues that, even if it be conceded that the phrase "national or international labor *union*" does not include a federation, nevertheless Congress used a broader term—"national or international labor *organization*," and that such term includes a federation. Absent any support for such an assertion in the legislative history, we cannot agree. It seems more reasonable to us that "organization" was used instead of "union" merely because not all bodies popularly known as unions are such by name. They are variously labelled union, brotherhood, association, guild, alliance, board, plan, etc.

■ One other argument is pressed upon us. It is said that, since both § 9(h) and § 304 [24] refer to "labor organizations" [25] and the Supreme Court has held that the C.I.O. is drawn within § 304, it follows that the A.F.L. is a "labor organization" within § 9(h). But the decision cited to us [26] contains neither holding, express or implied, nor discussion to the effect that the C.I.O. is a "labor organization" within § 304. The case was disposed of on grounds which made it unnecessary to consider that question.[27] Although we do not now concern ourselves with the construction of § 304, we recognize that the same words often do not mean the same thing in different contexts. A clear legislative history might require that federations, though not within 9(h), be included within § 304. So

19. House Report No. 245 on H.R. 3020 refers to the fact that "At least *11 great national unions* and a large number of local unions seem to have fallen into the hands of Communists, although in every case Communists appear to compose only a very small minority of the membership. In most of these cases the rank and file object to communistic influence in their unions." Id. at 329. [Emphasis supplied.] There are only *two* federations of importance, the A. F. L. and C. I. O.

20. Id. at 190, 250.

21. Id. at 921. (Emphasis supplied.)

22. The effect of non-compliance on the part of a single federation officer was stated by the Board to have been a fac-

tor in the congressional intent not to include federation officers within 9(h). Matter of Northern Virginia Broadcasters, Inc., 75 N. L. R. B. at 15.

23. 29 U.S.C.A. § 152(5).

24. Section 304 is now part of 50 U.S.C.A. Appendix, § 1509, which provides in pertinent part: "For the purposes of this section 'labor organization' shall have the same meaning as under the National Labor Relations Act [Title 29, §§ 151–166]."

25. Quoted 184 F.2d 237, supra.

26. See United States v. C. I. O., 1948, 335 U.S. 106, 68 S.Ct. 1349, 92 L.Ed. 1849.

27. Id., 335 U.S. at 110, 68 S.Ct. 1349, 92 L.Ed. 1849.

also, the fact that the policy and function of § 304 differ from that of 9(h) may require that it be given a different construction. Section 304, unlike the rest of the Labor Management Relations Act, is not keyed to collective bargaining but to political campaign contributions. It amends the Corrupt Practices Act rather than the National Labor Relations Act. It may be that the federation's status is not divisible in the performance of this political function, as it is with respect to the collective bargaining process around which 9(h) revolves; that the political activities of the federation on behalf of the locals and organizing committees directly chartered and supervised by it [28] cannot be separated from similar activities on behalf of its national and international member unions.

We are aware that our construction of 9(h) is in conflict with that of the Fifth Circuit in National Labor Relations Board v. Postex Cotton Mills, 5 Cir., 181 F.2d 919.

## II

■■ Petitioner contends that, even if the federation officers were not required to file, it was entitled to rely on the General Counsel's unofficial interpretation that such officers did have to file and, therefore, was justified in refusing to bargain with the locals. Aside from the fact that estoppel may not be invoked against the Government [29] and hence does not prevent the Board from overruling its General Counsel, we think there is another ground for decision on this point, although the Board does not rely upon it. Even if it were true that federation officers were required to file and had failed to do so, petitioner could not for that reason alone refuse to bargain. The failure of union officers to comply with 9(h) does not in any way relieve an employer of the paramount obligation to bargain collectively in good faith. The Act's only sanction for non-compliance is denial of Board facilities. Thus, if an unfair labor practice is committed by an employer, the union may not seek Board aid to compel him to cease and desist "unless there is on file with the Board an affidavit executed *contemporaneously or within the preceding twelve-month period*" [30] by the officers covered. Since this language specifically contemplates that the requisite affidavits may be filed *"contemporaneously"* with invocation of Board facilities, the unfair practice against which they are invoked obviously must have occurred earlier. It is thus the Board which refuses its processes to the non-complying union, not the employer. We do not think an employer may take the matter into his own hands and refuse to bargain with a union because its officers have not filed. If he does so, the ability of the union to successfully invoke Board processes thereafter, so long as its officers file beforehand, may result in his being cited for an unfair labor practice.

Unlike the phrase "national or international labor organization," we think the language of the statute is clear on this point. It is neither ambiguous nor a term of art depending upon technical sources for its meaning. We disagree with the contrary position taken by the Board in Matter of Andrews. [31]

## III

■ The Company seeks to argue that, even assuming federation officers were not required to file, it was under no obligation to bargain with the Union on September 19, 1947, because the Union did not represent a majority of the employees at that time. That point was not argued before the Board and cannot be raised for the first time here. [32] It is true that petitioner took exception to the Trial Examiner's finding of fact " * * * that on September 19, and November 8, 1947, and at all times thereafter the Union represented a

---

28. See note 5, supra.

29. United States v. City and County of San Francisco, 1940, 310 U.S. 16, 31–32, 60 S.Ct. 749, 84 L.Ed. 1050.

30. 29 U.S.C.A. § 159(h), quoted in full, supra, 184 F.2d 234. [Emphasis supplied.]

31. 87 N. L. B. No. 62.

32. 29 U.S.C.A. § 160(e); National Labor Relations Board v. Cheney California Lumber Co., 1946, 327 U.S. 385, 388–389, 66 S.Ct. 553, 90 L.Ed. 739.

majority of the employees in the appropriate unit, and was still the statutory bargaining agent for the employees therein." But ; such exception was taken "for the reasons more fully set forth in Respondent's Brief under B.P.–1–2–3–5–6–7, 9." None of the "reasons" thus incorporated by reference dealt with the question of majority status on September 19. Whatever reference was made to majority status was to the situation on November 8.

## IV

 Since petitioner committed an unfair labor practice by failing to bargain with the Union on September 19, 1947, any loss of majority subsequent to that date is attributable to the illegal refusal to bargain. Petitioner may not rely upon a loss of majority attributable to an unfair labor practice as a defense for his refusal to bargain on November 8, 1947.[33]

The order of the Board is affirmed and will be enforced. So ordered.

WILBUR K. MILLER, Circuit Judge, dissents.

33. Franks Bros. Co. v. National Labor Relations Board, 1944, 321 U.S. 702, 704– 705, 64 S.Ct. 817, 88 L.Ed. 1020; Medo Photo Supply Corp. v. National Labor Relations Board, 1944, 321 U.S. 678, 687, 64 S.Ct. 830, 88 L.Ed. 1007; National Labor Relations Board v. P. Lorillard Co., 1942, 314 U.S. 512, 513, 62 S.Ct. 397, 86 L.Ed. 380.