284 F.2d 212
 109 U.S.App.D.C. 78
 PUERTO RICO DRYDOCK & MARINE TERMINALS, INC., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitoner,
v.
ILA DISTRICT COUNCIL OF THE PORTS OF PUERTO RICO, ILA, Ind.,
and Local 1575, ILA District Council of The Ports
of Puerto Rico, ILA, Ind., Respondents.
 Nos. 15263, 15296.
 United States Court of Appeals District of Columbia Circuit.
 Argued March 3, 1960.
Decided June 9, 1960.
 
 Mr. Isidor E. Schlesinger, New York City, with whom Mr. Charles Patrick Clark, Washington, D.C., was on the brief, for petitioner in No. 15263.
 Mr. Louis Schwartz, Atty., National Labor Relations Board, for respondent in No. 15263 and petitioner in No. 15296. Mr. Thomas J. McDermott, Associate Gen. Counsel, National Labor Relations Board, Mr. Marcel Mallet-Prevost, Asst. Gen. Counsel, National Labor Relations Board, and Messrs. Melvin Pollack and Richard H. Frank, Attys., National Labor Relations Board, were on the brief for respondent in No. 15263 and petitioner in No. 15296.
 Mr. William B. Mischo. New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, for respondents in No. 15296.
 Before PRETTYMAN, Chief Judge, and BASTIAN and BURGER, Circuit judges.
 PRETTYMAN, Chief Judge.
 
 
 1
 These proceedings concern an order of the Labor Board involving the discharge of eleven employees of the petitioner company. The Board found the request for the discharge and the discharge to be in violation of Section 8(a)(1), (a)(3), (b)(1)(A), and (b)(2) of the Act.[1] It ordered the company and the union to cease and desist from the activities of which complaint had been made, and also to reinstate the discharged employees. The company petitioned for review, and the Board filed an answer and cross application for enforcement against it (the company). That porceeding is here as No. 15263. The Board also filed a petition for enforcement of its order against the union. That petition is here as No. 15296.
 
 
 2
 The District Council named as respondent here is the representative of the International Longshoremen's Association of Puerto Rico, which in turn is affiliated with the International Longshoremen's Association, Independent. Various local unions are affiliated with and constituent parts of the former and thus are supervised and controlled by the District Council. Among these locals were Local 1575 and Local 1674. Prior to 1954 Local 1575 represented stevedores, and Local 1674 represented clerks and maintenance employees, throughout the island. Dissension arose in Local 1674, and by February, 1954, it had become entirely inactive. At about that time, in a Board-conducted election, employees of the company expressed their desire to be represented in a separate, signle-employer unit. The Board certified the District Council as the representative of a bargaining unit composed of approximately 100 of the company's drydock workers, all of whom were engaged in maintenance work. The District Council and the company entered into a written agreement. That agreement did not contain a union-shop clause but did contain a check-off provision. Shortly thereafter, in July, 1954, Local 1575 held a special meeting, to which the drydock employees of the company were invited. The President of the District Council proposed that the remaining members of the then-inactive Local 1674 be consolidated with Local 1575 upon payment of the same monthly dues they had been paying to Local 1674. Very few accepted this proposal, and from 1954 to 1956 very few employees in the bargaining unit paid dues to any District Council affiliate.
 
 
 3
 In the early months of 1956 the bargaining agreement was renegotiated. A union-shop clause, requiring affiliation with the union after thirty days of employment, was to be included as part of the new agreement. On the morning of April 9, 1956, the employees learned that the wage increases provided in the new contract were not to be retroactive to January 1, 1956, as they had expected. The employees held a meeting and protested both to the District Council and to the company. They also conferred with representatives of a rival union. This rival union was UTM District Council No. 15, which was an AFL-CIO affiliate. Nevertheless the District Council and the company executed the new agreement. On April 11th approximately 100 employees in the bargaining unit filed written notices revoking their consent to the dues check-off in favor of the District Council. By telegram on that same day certain workers, purporting to act on behalf of all the workers in the unit, repudiated the April 9th contract and demanded that the company receive a delegation of workers. On April 21st approximately 55 workers, in a telegram to the company, repudiated the contract and authorized the rival AFL-CIO local to represent them in collective bargaining. The company took the position that, since the District Council had been certified by the Board, it (the company) was compelled to negotiate with that union.
 
 
 4
 In June, 1956, the District Council wrote a letter to each member of the bargaining unit, calling attention to the union-shop clause, to the fact that the union had waited sixty days before reminding employees of their obligations to the union, and formally requesting them to pay the dues in arrears within ten dyas. The letter stated: 'The initiation fee is $75.00 and the monthly dues is $2.00.' The letter notified the employees that, if within the specified period they had failed to make payment or to make arrangements for payment, 'we shall regret having to request the Employer to terminate your employment.' Thereupon a number of the drydock employees notified representatives of the District Council and of the company that they would pay the monthly dues but refused to pay an initiation fee because they had already paid an initiation fee to the then-inactive Local 1674. The District Council refused to accept the proposal, contending that since they had not paid dues for more than six months they had lost all their rights in the entire union, i.e., in the affiliated group of which the District Council was the hub. Thereupon the union requested the company to discharge seven employees. An active and acute contoroversy ensued. There was a strike and a riot, and the company closed down the drydock. The seven dischargees were reinstated by the company pursuant to a stipulation which provided, inter alia, that the workers would pay their debts to the union. Conferences between the company and the employees followed, then conferences between the union and the employees, but the employees still refused to pay the initiation fee. They rejected a proposal by the President of the District Council that the debts to the union be paid in installments. Finally the union again invoked the union-shop clause and requested the discharges of eleven employees. These employees were discharged.
 
 
 5
 Charges of unfair labor practices were filed, a complaint issued, and the controversy referred to a trial examiner of the Board. The trial examiner gave little, if any, wight to the facts regarding the efforts of certain of the employees to transfer representation to the AFL-CIO union. It was a fact that the employees who were discharged were the ringleaders in that movement. The trial examiner concluded that the discharges were because of the failure to pay union dues. From that finding it followed that since the union-shop clause was legal the requirement that the employees pay dues was legal and their discharges when they refused to pay were also legal. The Board, however, was more impressed with the force of the facts concerning the rival union activity. It pointed to certain somewhat dramatic incidents as being of great weight. Thus the Board called attention to a statement allegedly made by the President of the District Council to these employees that if they terminated their activities in behalf of the rival union the District Council would forego collection of the initiation fee. The Board also gave great weight to a letter which the District Council sent to each dischargee, stating various reasons for the discharge, referring to the work stoppage, etc., but not mentioning the dues dispute. The Board also considered as having high significance a written statement signed by the President of the District Council, in which he said that the refusal of the dischargees to pay dues and initiation fees had nothing to do with the requests for their discharge.
 
 
 6
 Another circumstance which lends itself to the inference drawn by the Board from the whoel record is the separate treatment accorded the eleven by the union. On July 21st the union offered to accept dues and fees from all the employees in installments, but all the emplouees rejected the offer. On July 23rd the union requested the discharge of the eleven. They were discharged on August 3rd, and their attempt immediately thereafter to accept the July 21st offer was refused by the union. Now, it is probably true that in such a situation, instead of requesting the sischarge of all recalcitrants, which would have meant a shut-down of the plant, the union might properly proceed first by a sort of 'pilot' step. That is, it might first request the discharge of a few employees in order to demonstrate the seriousness of its requirements. But in this case the union picked out for this initial test the eleven who were the leaders of the rival union effort. Why these sleven? A justifiable inference is that some consideration other than non-payment of dues might have entered into the choice. Then, after the eleven had been discharged, the union on August 14th called a meeting of the remaining employees to receive 'instructions' as to the payment of fees and dues. That notice, which was in writing, contained a clear warning of drastic steps to be taken against those who failed to attend. All these employees attended and agreed to pay up. The cleavage instituted by the union between the eleven and the others gives some additional support to the Boad's ultimate finding that the eleven were discharged for reasons other than the failure to pay the dues and fees.
 
 
 7
 Thus the trial examiner and the Board differed as to which items of the evidence were of the greater weight and significance. The question, of course, was: What was the real reason for the discharges?[2] The trial examiner thought the real reason was the failure to pay the initiation fees; the Board thought the real reason was the rival union activity. The crucial considerations were not considerations of demeanor but rather rested upon certain oral factual testimony which was undisputed, and upon letters, notices, and a transcript of a conference. There were bitter disputes as to truthfulness in some respects; for example, there was a bitter dispute about the circumstances of the signing of the statement by the President of the District Council avove referred to. We cannot say that the conclusions of the Board were not supported by substantial evidence on the record as a whole, including the trial examiner's findings as part of that record. The Board did not ignore those findings; it referred to them, discussed the evidence, and differed with the examiner as to the conclusions-- in the language of administrative agency adjudication called the 'ultimate facts'-- to be drawn from the evidentiary facts-- the 'basic facts'. The Board's ultimate findings were rational, reasonable, and had support in the evidence as a whole, including the finding that the company 'had reasonable grounds for believing that the Respondent Unions demanded the discharges here in question for reasons other than the failure of the employees to tender the periodic dues and initiation fees uniformly required as a condition of acquiring or retaining membership.' This was the Board's responsibility under the statute.
 
 
 8
 Two subsidiary points remain to be examined. The company urges that the case as to two of the eleven employees is different from that as to the remaining nine. The trial examiner, although finding for the company concerning the nine, held against the company as to the other two. For reasons sufficient to it, the company did not take exception to the examiner's findings concerning the two. We think the company is precluded by the clear language of the statute[3] from raising any points concerning the two. This is so regardless of whether the questions raised be considered questions of law, questions of fact, or mixed questions of fact and law.[4] The company relies upon National Labor Relations Board v. Richards[5] as establishing that the statutory proscription applies only to questions of fact and not to questions of law. But in that case the trial examiner's initial decision on the disputed point was in favor of the company, which was the ultimate respondent in the enforcement proceeding of the court. So the argument there, as the court pointed out, really was whether there existed an implied requirement for a motion before the Board for rehearing or to amend the judgment. We do not have that problem in the case before us.
 
 
 9
 The union objects to the broadness of paragraph II(1)(b) of the Board's order, which prohibits the union from interfering 'In any other manner' with employee rights under Section 7 of the Act. We agree with the union's objection. There is no evidence in the record indicating that the union had ever been or was likely to be guilty of other types of unfair labor practices, some of which might constitute violations of Section 8(b)(1)(A) as well as the more specific sections of the Act, and thus the order must be modified.[6] Accordingly, paragraph II(1)(b) is is modified to begin, 'In like or related manner restraining or coercing employees * * *.'[7] The second paragraph of the notice to be posted by the union will be similarly modified. The company has not objected to the scope of the order, nor has the union made any other objection to its scope.
 
 
 10
 As modified, the Board's order will be enforced.
 
 
 11
 BASTIAN, Circuit Judge, dissents in part, believing that the record as a whole supports the findings of the trial examiner and not those of the Board insofar as the nine employees are concerned. He agrees, however, that the company is precluded from raising any points concerning the two employees referred to in the opinion and, if the order of the Board is to be enforced, that it should be modified in the manner provided in the majority opinion.
 
 
 
 [1]
 Taft-Hartley Act, 61 Stat. 140 (1947), 29 U.S.C.A. 158(a)(1), (a)(3), (b) (1)(A), (b)(2)
 
 
 [2]
 See e.g., National Labor Relations Board v. Mechanics Educational Society, 6 Cir., 1955, 222 F.2d 429; National Labor Relations Board v. Local 169, etc., 3 Cir., 1955, 228 F.2d 425
 
 
 [3]
 29 U.S.C.A. 160(e): '* * * No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances. * * *.' The quoted passage is actually in Sectiin 10(e) of the statute, relating to enforcement proceedings. But Section 10(f), relating to review proceedings, refers specifically to the proceedings as provided in 10(e); and, moreover, the present case is before us not only upon a petition for review but also upon a cross-petition for enforcement. The courts seem to have treated the quoted language as applicable to both review and enforcement provisions
 
 
 [4]
 National Labor Relations Board v. Cheney Lumber Co., 1946, 327 U.S. 385, 388-389, 66 S.Ct. 553, 90 L.Ed. 739, and cases cited; National Labor Relations Board v. Associated Muscians, 2 Cir., 1955, 226 F.2d 900, 906-907, certiorari denied, 1956, 351 U.S. 962, 76 S.Ct. 1025, 100 L.Ed. 1483; National Labor Relations Board v. Penkerton's Nat. Detective Agency, 9 Cir., 1953, 202 F.2d 230, 233, West Texas Utilities Co. v. National Labor Relations Board, D.C.Cir., 1950, 87 U.S.App.D.C. 179, 184 F.2d 233, certiorari denied, 1951, 341 U.S. 939, 71 S.Ct. 999, 95 L.Ed. 1366
 
 
 [5]
 3 Cir., 1959, 265 F.2d 855, 862
 
 
 [6]
 The basic doctrine is stated in National Labor Relations Board v. Express Pub. Co., 1941, 312 U.S. 426, 437, 61 S.Ct. 693, 700, 85 L.Ed. 930: 'To justify an order restraining other violations it must appear that they bear some resemblance to that which the employer has committed or that danger of their commission in the future is to be anticipated from the course of his conduct in the past.' See Morrison-Knudsen, Inc. v. National Labor Relations Board, 9 Cir., 1959, 270 F.2d 864
 
 
 [7]
 This was the scope of the order recommended by the trial examiner. We therefore need not pass upon tje Board's contention, urged upon us at oral argument, that the union cannot object to the scope of the order because it failed to object to the scope of the order recommended by the trial examiner. See National Labor Relations Board v. Lummus Co., 5 Cir., 1954, 210 F.2d 377. The situation before us is thus not the same as that in Precision Fabricators, Inc. v. National Labor Relations Board, 2 Cir., 1953, 204 F.2d 567, where the Board had adopted verbatim the examiner's recommendation