John SZYBSKI, Plaintiff,

v.

The UNITED STATES of America, Defendant.

Stanley SZYMCZAK, Plaintiff,

v.

The UNITED STATES of America, Defendant.

Carl MITCHELL, Plaintiff,

v.

The UNITED STATES of America, Defendant.

Carl C. IBIS, Plaintiff,

v.

The UNITED STATES of America, Defendant.

Nos. 62-C-161—62-C-164.

United States District Court
E. D. Wisconsin.

Aug. 23, 1963.

**TEHAN, Chief Judge.**

The sole question presented in the above cases, which were tried to the court on June 7, 1963, is whether certain bingo-type coin-operated pinball machines were "so-called 'slot' machine(s)" or gaming devices within the meaning of § 4462(a) (2) (A) of the Internal Revenue Code of 1954, as contended by the defendant, or "amusement machine(s)" within the meaning of § 4462(a) (1) (C) of the Internal Revenue Code of 1954 as contended by the plaintiffs. Each of the plaintiffs is a resident of and operates a tavern within this district. Each had on his premises during the period involved in his action one or more of the machines which we shall hereinafter describe, and filed Form 11–B, Special Tax Return, paying the $10.00 per machine tax imposed by § 4461(a) (1) on amusement devices. The District Director of Internal Revenue determined that the machines were gaming devices and that each plaintiff was liable for the $250.00 per machine tax imposed by § 4461(a) (2). Each plaintiff paid the additional taxes and penalties resulting from that determination, filed a timely claim for refund which was disallowed and now seeks a refund of such additional taxes and penalties, plus interest.

The machines involved in these actions, all coin-operated, are known as "Big Show," "Dude Ranch," "Coney Island" and "Bright Spot." When the coin is inserted, five steel balls are made available to the player. In some instances, the balls are propelled by hand from the front of the machine up and across a glass surface covering the playing board to an opening in the glass at the top of the board which opening extends the width of the glass. The player cannot control the balls after they have dropped through the opening onto the playing board and as they roll down the board. In other instances the balls are hand propelled up a track, about twelve inches of which is uncovered, at the right hand side of the machine. When they reach the top of the track they roll down and across the playing board. The balls can-

Herbert L. Mount, Milwaukee, Wis., for plaintiffs.

Donald Anderson, Dept. of Justice, Tax Division, Washington, D. C., James B. Brennan, U. S. Atty., Milwaukee, Wis., for defendant.

not be controlled by the player beyond the uncovered section of the track.

The playing boards of all of the machines have twenty-five numbered holes interspersed on the playing surface. Each machine has a bingo-type score card or cards on its front vertical glass panel (backboard). If a ball drops into one of the numbered holes on the playing board, the corresponding number on the machine's bingo card or cards, if more than one card has been activated, lights. The object of the game on each machine is to light up three, four or five numbers in a vertical, horizontal or diagonal line on the bingo cards. If this object is attained, a score is registered on a three-digit meter located on the machine. A normal score value is four, sixteen and seventy-two for three, four and five in line respectively, but the amount of score depends on the value or odds at the time as shown by numbers on the backboard.

Special features of the machines involved herein are as follows:

## A. BIG SHOW

In addition to one large bingo card, the Big Show has two available features called "Four Corners". Each feature has the four corner numbers of the bingo card. Each "Four Corner" feature is activated by chance. An additional score is awarded if the player lights all four numbers of either or both features.

A feature available by chance changes the normal score value previously mentioned to a substantially greater value.

## B. DUDE RANCH

This machine has two bingo-type cards. The second score card is available to the player at his option. The activation of this feature does not depend upon chance. Utilization of the second score card increases the possibility of gaining a higher score.

A feature termed "rollover buttons" is available to the player of this machine. The activation of the fea-ture is by chance. Upon activation, the numbers "2," "4" and "8" light on the bingo cards, this decreasing the odds against lighting three, four and five in line.

A "Number Selection Feature" is available by chance to the player. When operative, this feature permits the player to light any one of seven numbers on the bingo cards. The number must be selected before rolling the fourth ball. This is accomplished by rotating a knob.

A "Super" card is also available by chance to the player. This card has nine numbers varying from one to twenty-five. The feature is available by chance. Lighting of three numbers in line results in the awarding of a four-in-line value. No score is obtained from this feature if the player has been successful in lighting four numbers in line on either bingo card during the game.

A "Selector" feature is available by chance to the player. After activation, this feature permits activation of the "Super" card (if not already activated) and of a "Super-Line" on one of the two bingo cards. The "Super-Line" is the top line of the bingo card. Upon lighting two numbers in line on the "Super-Line", the player is awarded a "four-in-line" value.

## C. CONEY ISLAND

The machine has three bingo cards. The second and third cards are available at the option of the player. The activation of the additional cards does not depend on chance. This machine has no other features.

## D. BRIGHT SPOT

This machine has six bingo cards and operates similarly to the "Coney Island". Utilization of the additional score cards increases the possibility of gaining higher scores.

A "Spot" feature is available by chance to the player. On any game,

the central number shown on any or all cards can light up if the score button is pressed often enough and the player has a sufficiently high score. The lighted number is available only during the particular game during which the "Spot" feature became operative.

Each machine accepts only one coin per game. After the five balls made available to the player upon insertion of a coin have been used, that is, after the game has been completed, another coin must be inserted in order that play can be continued.

Insertion of a coin to continue play in a new game does not cause the scoring meter to return to zero. Rather, the score can be accumulated over a number of games or, at the option of the player, can be utilized for the purpose of activating special features on the machine increasing the possibility of obtaining a higher score. A score shown on the meter and not used up by a player in activating or attempting to activate available features can be cleared only by interrupting the electrical current, either by pressing a button located under the machine or by removing the power cord from the wall socket.

None of the special features on any of the machines involved herein can be activated until the player has obtained a score in a preceding game. The features may then be activated by pressing the score button, the score on the meter being reduced by one each time the score button is pressed. Those features described above as activated or available by chance may or may not be activated upon the pressing of the score button and resultant reduction of the score.

Each of the machines is equipped with a "Tilt" mechanism and with an "Anti-Cheat" device. The "Tilt" mechanism terminates the game if the machine is moved or banged by the player to control the course of the ball across the playing board, and the "Anti-Cheat" device prevents the player from rolling extra balls into the game and turning off the current to a game in order to manipulate the balls into the proper holes or to get them back.

None of the machines involved herein has any provision or facility for returning a coin or coins to the player in the form of a refund or a pay-off. None awards free replays. There is no evidence that pay-offs were ever made to any player on the basis of the score he attained and no evidence that they were not. None of the machines has any meter or other device for recording scores cleared from the scoring meter by interrupting the electrical current, that is, scores attained by the players and not utilized. No provision is contained in any of the machines for multiple coin insertion to increase the odds.

We have considered the pleadings, the stipulation of facts and amendments thereto filed by the parties, the evidence presented at the trial, the arguments of counsel presented both orally and in their briefs, and the entire record in these actions and must hold on the basis of that record that the machines in question are amusement and not gaming devices.

Under § 4461(a) (2) a tax of $250.00 a year is imposed "in the case of a device defined in paragraph (2) of section 4462(a)" which paragraph defines a gaming device in relevant part as:

"(A) a so-called 'slot' machine which operates by means of the insertion of a coin, token, or similar object and which, by application of the element of chance, may deliver, or entitle the person playing or operating the machine to receive, cash, premiums, merchandise, or tokens,"

and under § 4461(a) (1) a tax of $10 a year is imposed "in the case of a device defined in paragraph (1) of section 4462 (a)" which paragraph includes:

"(C) an amusement machine operated by means of the insertion of a coin, token, or similar object, but not including any device defined in paragraph (2) of this subsection,"

The machines with which we are here concerned are unquestionably so-called slot machines operating by means

of insertion of coins.[1] United States v. Korpan (1957) 354 U.S. 271, 77 S.Ct. 1099, 1 L.Ed.2d 1337. It is also clear, and appears to be conceded by the plaintiffs, that the element of chance governs to a great extent the success of a player in accumulating a score on the machines. We need only here determine therefore whether the machines may deliver or entitle the players to receive cash, premiums, merchandise or tokens. That determination is to be made from the features, characteristics and functioning of the machines themselves. United States v. Nine Gambling Devices (S.D.Ill., 1957) 59–2 U.S.T.C. ¶ 15,257.

■ We are aware that § 4462(a) (2) (A) refers to machines which "may" deliver or entitle the player or operator to receive an award. It is our belief that the word "may" was used to express and emphasize the fact that an element of chance must be involved, that is, to indicate that because of the gaming features inherent in the machine, an award will not always be forthcoming. Nothing in the authorities cited to us or in the legislative history or administrative interpretations which we have examined indicates that because of the use of the word "may" § 4462(a) (2) (A) includes within its scope machines lacking the characteristics of gaming devices the use of which may be perverted to gambling. If the section were interpreted that broadly, and since under § 4462(a) (2) (B) machines need not be coin-operated to be considered gaming devices, such devices as ordinary cigarette lighters, which may or may not light on the first try, or which may or may not light three

times in a row, would be subject to a $250.00 tax.

The defendant has cited four cases only in support of its position that the plaintiffs' pinball machines are gaming devices. The machines involved in all of those cases were substantially different from those involved in the cases at bar in the following significant respects:

1. In United States v. Korpan, supra, the defendant's machines (a) awarded free games, (b) contained a provision for multiple coin insertion to increase the odds, (c) registered free games won but not played off on a replay meter inside the machine. (See United States v. Korpan (C.A.7, 1956, 237 F.2d 676)

2. In Harvey v. United States (D.Or., 1962) 214 F.Supp. 80, both machines held to be gaming devices awarded up to 999 free games. One contained a provision for multiple coin insertion to increase the odds.

3. In Turner v. United States (D. Kans., 1962) 62–1 U.S.T.C. ¶ 15,402, the plaintiff's machine (a) awarded up to 999 free games, (b) contained a provision for multiple coin insertion to increase the odds, (c) registered free games won but not played off on a meter.

4. In United States v. Nine Gambling Devices, supra, all machines (a) awarded up to 1000 free games, (b) contained a provision for multiple coin insertion to increase the odds, (c) registered free games won but not played off on a meter.

In awarding free games, each of the machines involved in the above cited cases, unlike the machines in these cases, contained a built-in payoff awarding successful players the equivalent of cash.[2]

---

1. The 1958 amendment to § 4462 need not be considered here, since all the machines involved are coin-operated.

2. See Annotation, 89 A.L.R.2d 815 *Coin-operated pinball machine or similar device, played for amusement only or confining reward to privilege of free replays, as prohibited or permitted by antigambling laws"* at Page 823, where the following conclusion is set forth:
"* * * It has often been said that the price which a player is willing to pay

for a pinball game is indicative of the value which a free additional game has. It has often been assumed that the amusement which a player derives from free replays itself has value, or that the player is inserting a coin in the hope of gaining something of value other than free replays. Although a few decisions have suggested that free replays have no value because they are incapable of being sold, the prevailing view indicates that the contrary is true. A player may either sell his free replays to other

 

In addition, the number of free games obtainable was so great that to assume that they were the sole reward for proficiency on the machines would have been unrealistic. It was far more reasonable to assume that free games won but not played were redeemable in cash, since players leaving the machines without having played all the free games they had won would be abandoning something of value. Particularly is this true where the machines kept a record of free games won but not played, which record could only be useful "as an accounting device which permits the collection man to determine the number of games paid for by the proprietor for the purpose of reimbursing him." (United States v. Korpan (C.A.7, 1956) 237 F.2d 676 at 679). So, too, the provision for multiple coin insertion to increase the odds, contained in most of the machines involved in the above cases and not contained in the plaintiffs' machines, would be pointless in a machine not devoted to gambling.

The defendant has attempted to equate the score attained on the plaintiffs' machines in these cases with free game awards made by machines in the cases cited. In our opinion such an equation is faulty. When a player ceases play on one of the plaintiffs' machines leaving a score on the meter, he is not abandoning the equivalent of the cost of a number of games.

Neither do we consider it significant that the score obtained on one of the plaintiffs' machines can be carried over and accumulated or used by a player to increase odds in a subsequent game. Each subsequent game must be purchased on the plaintiffs' machines unlike the free game machines. The use of a portion of the score to increase odds in a later game does not constitute an expenditure of anything of value.

We conclude that nothing in the features, characteristics and functioning of the plaintiffs' machines renders them

players, perhaps at a discount, or he may exchange them for a cash payoff by the machine's proprietor. Thus the majority of the cases have treated free replays

gaming devices per se since nothing in their inherent design indicates or compels the conclusion that any award may be made to successful players. The machines are therefore amusement devices within the meaning of § 4462(a) (1) (C) and the tax imposed is the $10.00 tax specified in § 4461(a) (1).

Counsel for the plaintiffs will prepare findings of fact and conclusions of law in accordance with this opinion and submit them to opposing counsel for approval as to form.

as something of value: either the free amusement has value in itself, or it has value because it is capable of being exchanged for material rewards."