**UNITED STATES of America,**
**Libelant,**

v.

**ONE BALLY "BARREL–O–FUN" COIN–OPERATED GAMING DEVICE, Serial No. B83483391 and one Bally "Lotta Fun" Coin-Operated Gaming Device, Serial No. B57634263, Respondent.**

Civ. No. 8116.

United States District Court
M. D. Pennsylvania.

Dec. 31, 1963.

Bernard J. Brown, U. S. Atty., with him Julius Altman, Asst. U. S. Atty., Scranton, Pa., for libelant.

Paul A. McGlone, Thomas J. Jones, Scranton, Pa., for Hugo Brozzetti.

NEALON, District Judge.

On March 28, 1963, agents of the Internal Revenue Service seized two coin-operated machines, to wit: one Bally "Barrel-O-Fun" Coin-Operated Device, Serial No. B83483391, and one Bally "Lotta Fun" Coin-Operated Device, Serial No. B57634263, from premises located at 402 Pittston Avenue, Scranton, Pennsylvania.

A complaint was filed on April 5, 1963, by Hugo Brozzetti (Civil Action No. 8062), alleging he is the owner of the two coin-operated devices, and by George Brocavitch, who asserts that (a) he is the operator of George's Lunch at 402 Pittston Avenue, Scranton, Pennsylvania, and (b) the aforesaid coin-operated devices were located in his restaurant under lease from Hugo Brozzetti on the date of seizure. The complaint sought a preliminary injunction restraining the District Director of Internal Revenue from classifying the aforesaid devices as coin-operated gaming devices; from assessing said machines at the yearly tax rate of $250.-00; from seizing and forfeiting the devices, and finally, that the devices be returned to plaintiffs.

Thereafter, the United States Government filed a Libel of Information (Civil Action No. 8116) alleging that George Brocavitch was engaged in the business of maintaining for use and permitting the use of coin-operated gaming devices in violation of Section 4901(a), Title 26 United States Code, inasmuch as he had not paid the special tax required by Section 4461(a) (2) of Title 26 United States Code. As a result, the Government requests that the devices be condemned and forfeited to the United States under the provisions of Section 7302, Title 26 United States Code. The Government also moved to have the complaint dismissed because it sought to enjoin the assessment of a tax, which action is barred by Title 26 U.S.C. § 7421, and for various other reasons which were not pursued by the Government. By agreement of the parties, both cases were consolidated for the purposes of trial.

A hearing was held on August 26, 1963, at which time testimony was taken and arguments presented. At the hearing Mr. Brozzetti and Mr. Brocavitch further alleged that the devices were illegally seized from the premises, in that the Internal Revenue Agents did not have a search warrant to support their actions.

From the stipulations of the parties and the evidence presented at the hearing, we make the following

### FINDINGS OF FACT

1. The machines in question, one Bally "Lotta Fun", Serial No. B83483391, and one Bally "Barrel-O-Fun", Serial No. B57634263, were seized on March 28, 1963, from the premises known as "George's Lunch", 402 Pittston Avenue, Scranton, Pennsylvania, where they had been maintained for use by the public. George Brocavitch was the proprietor of "George's Lunch," 402 Pittston Avenue, Scranton, Pennsylvania, at the time the machines were seized. The machines in question are substantially identical, being standard pinball machines of the "bingo" type.

2. The machines consist of an inclined glass-covered playing surface which has twenty-five numbered holes therein. The playing surface is studded with pegs and bumpers to obstruct a ball descending the plane and cause it to take erratic courses.

3. The score board of each machine is a vertical plate glass facing the player from the opposite end of the playing area. It contains six bingo cards. Each card is made up of five rows of five numbers directly under each other in the classical bingo fashion from 1 to 25 in no apparent order.

4. By inserting a five-cent coin into the machine it becomes electrically activated, five balls are released for play, and one bingo card is lit and playable. The insertion of a second nickel before shooting a ball puts the second bingo card in play, and so on up to six cards for six nickles inserted. The insertion of the sixth nickle will also light the center number on the sixth card, thus "spotting" this number for the player.

5. The machine is played by propelling the balls onto the inclined playing surface by means of a spring plunger, where they descend through a maze of pegs and bumpers eventually dropping into a numbered hole, thus lighting a corresponding number on the bingo cards on the backboard.

6. The initial course of the ball can be controlled somewhat by the player, depending on the force applied to the plunger. Thereafter the descent of the ball down the playing surface is determined predominantly by chance. The player can, however, by applying force to the cabinet containing the machine, determine to some extent the direction of the ball and the speed with which it proceeds over the playing surface. This determination is limited, however, by the existence of an adjustable tilt mechanism which deactivates the machine when too much force is applied to it by the player.

7. The object of the play is to illuminate numbers in line on the bingo cards. If three numbers are lit in a row, either horizontally, vertically or diagonally, the machine awards the player four free replays. Twenty free replays are awarded for four numbers lit in a row, and 100 free replays are awarded for five numbers in a row. Free plays award-

ed are indicated by lighted numbers, in multiples of 100, on the backboard (i. e., 100 equals one free play, 200 equals two, etc.); the machine will accumulate a maximum of 295 free replays. There is no device or limitation that appears in the machine that would limit the player's ability to win games.

8. Normally no coin is necessary to play a free game. The machine contains a red button on the front of the cabinet which, when pushed, removes a free game from the backboard and lights a bingo card. The player, if he has more than one free play, has the option of either playing a number of games with one card lit or one game with a number of cards lit, depending on the number of free plays he has won. However, an adjustment can be made to the machine so that a nickle is required to activate the machine, even when free plays are recorded. After the machine is activated by the coin then the button is pushed to reduce the free games and light additional cards.

9. It is not necessary to play all free games accumulated to return the machine to zero. By holding the red button in, all the free plays recorded are released or knocked off and the machine returns to its original state. There is also a knock-off circuit in the machine which removes all free replays when an electrical contact is made to close the circuit. The machine contains two wires which serve as a trip mechanism for the knock-off circuit. When the machines were confiscated these two wires were connected to a conduit in the wall and had to be disconnected. Games can be rapidly removed by pushing a concealed button located any place in an establishment if the wires are connected to it.

10. The machines also contained two bolts on the side of the cabinet spaced about the distance of the diameter of a quarter or the length of a key. If the trip mechanism wires were connected to the bolts, then the games could be knocked off by touching a key, quarter, or some other metallic object to the bolt heads, thereby closing the circuit.

11. These machines did not contain a meter for recording the number of games knocked off. However, they do have the wiring to which such a meter can be easily attached.

12. A device known as a coin divider is located in the front of both of these machines. Its function is to direct the inserted coins into two separate boxes, one located in front and the other on the side, according to a pre-determined and adjustable ratio.

13. The machines are equipped with an "in-line" score adjustment. By adjusting plugs inside the machine, the owner determines how many free games the player can win for scoring three "in-line", four "in-line" or five "in-line."

14. A $10.00 amusement tax stamp had been purchased for both machines in question. Neither contained the $250.00 gambling tax stamp.

## DISCUSSION

Title 26 U.S.C.A. § 4461 provides in pertinent part:

"There shall be imposed a special tax to be paid by every person who maintains for use or permits the use of, on any place or premises occupied by him, a coin-operated amusement or gaming device at the following rates:

"(1) $10 a year, in the case of a device defined in paragraph (1) of Section 4462(a);

"(2) $250 a year, in the case of a device defined in paragraph (2) of Section 4462(a);

\* \* \*

Section 4462 reads:

"(a) In general—As used in sections 4461 to 4463, inclusive, the term 'coin-operated amusement or gaming device' means—

\* \* \*

"(2) So-called 'slot' machines which operate by means of insertion of a coin, token, or similar object and which, by application of the element of chance, may deliver, or entitle the person playing or operating the

machine to receive cash, premiums, merchandise, or tokens."

The issue to be resolved here then is whether the seized machines in question are gaming devices as described by Section 4462(a) (2).

■ It is undisputed in this case that the machines are slot machines which are operated by the insertion of a coin. Also obvious is the fact that the application of chance determines the outcome of the play. The question remains—is the machine so constructed and designed that its play may deliver, or entitle the person playing or operating the machine to receive cash, premiums, merchandise or tokens? It must be remembered that Courts clearly recognize that evidence of actual payoffs in connection with per se gaming devices is unnecessary; a showing that the machines possess the features that may deliver or entitle the person playing or operating the machine to receive cash, premiums, merchandise or tokens is sufficient. Turner v. United States, 9 AFTR2d 2031 (1962) (P-H); United States v. Nine Gambling Devices, 4 AFTR2d 6187 (1957) (P-H).

■ After careful analysis of the testimony it is concluded that the machines are so designed that their play may deliver or entitle the person playing, to receive cash or merchandise. Thus they are gaming devices as defined by the Internal Revenue Code, subject to the $250.00 gambling tax stamp.

The two most important factors leading to this decision are (1) the large number of free plays that can be won by the player, and (2) the fact that free plays won need not be played off, but may be eliminated from the machine by use of a knock-off button and a knock-off circuit. As the United States District Court in Kansas stated in Turner v. United States (supra), "such devices are specially adapted for use as gambling devices." That Court reasoned as follows:

"The knock-off button for releasing free plays and the meter for recording the free plays released or the

provision for multiple coin insertion to increase the odds serve no useful purpose on a machine designed merely for amusement and they increase the cost of the machine without increasing the income from the machine when used for amusement."

Here there is no increase in the odds by the insertion of additional coins, but the player's chances of winning are enhanced as each nickle is inserted because an additional card is playable and the insertion of a sixth nickle gives the player a relative advantage by spotting the center number on the sixth card. These machines were not only equipped with a knock-off circuit, but, according to Agent Emery Simkulak of the Internal Revenue Service, the wire from this circuit actually led from the back of the machine into an electrical conduit. Thus the knock-off aspect was not only inherently present in these machines, but was, in fact, externally operable. Although these machines have no meters for recording the free plays released, a meter is not essential for the carrying on of the gambling operation. It is merely a measure employed by the owner for his protection, keeping a check on the amount the proprietor had to pay out in cash, premiums or tokens.

Treasury Department Regulations concerning "Coin-operated Gaming Devices" are, for the most part, a restatement of the statutory language. However, 26 C.F.R. 45.4462–1 (6) (2) reads in part, as follows:

"(2) *Examples of machines or devices within scope of section 4462 (a) (2).* The following devices and machines illustrate the type of machines or devices within the scope of section 4462(6) (2):

"(i) A machine which is operated by means of the insertion of a coin, token, or similar object and which, even though it does not dispense cash or tokens, has the features and characteristics of a gaming device

whether or not evidence exists as to actual payoffs.

\* \* \*

" '(iii) A pinball machine equipped with a push button for releasing free plays and a meter for recording the plays so released, or equipped with provisions for multiple coin insertion for increasing the odds.' "

Internal Revenue Rulings have been issued by the Internal Revenue Service in connection with defining and describing coin-operated gaming devices.[1] Their content is substantially the same as the Regulations quoted above.

Treasury regulations must be sustained unless unreasonable and plainly inconsistent with the Revenue statutes and they constitute contemporaneous constructions by those charged with administration of these statutes which should not be overruled except for weighty reasons. Commissioner of Internal Revenue v. South Texas Lumber Company, 333 U.S. 496, 68 S.Ct. 695, 92 L.Ed. 831 (1948); Fawcus Machine Company v. United States, 282 U.S. 375, 51 S.Ct. 144, 75 L.Ed. 397 (1931). Revenue Rulings indicate and are evidence of the administrative construction of the statute. It is well established that the administrative construction of a statute by the agency charged with the duty of enforcing or applying it is entitled to great weight. Federal Trade Commission v. Mandel Brothers, 359 U.S. 385, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959); West Texas Utilities Company v. National Labor Relations Board, 87 U.S. App.D.C. 179, 184 F.2d 233 (8th Cir. 1950); Circle Discount Corporation v. United States, 211 F.Supp. 743 (D.D.C. 1962).

These machines are such that their physical makeup brings them easily within the statutory definition of a gaming device and its constructions and interpretations not only under the Regulations, but also by Treasury Rulings and case law.

---

1. Revenue Ruling 59–294, C.B.1959–2, 340. Revenue Ruling 60–102, C.B.1960–1, 355.

A realistic look at the question would also lead to the same conclusion. At the hearing the Government called as its principal witness a Mr. Wayne Neyens, who qualified as an expert in the field of coin-operated amusement and gambling devices. He testified that normal amusement devices return only three free plays per game and will accumulate no more than ten to fifteen at a time. On the other hand, the machines before the Court can return up to 100 free games for each game played and will accumulate 295 at one time. This feature is more compatible with gambling than with amusement. Moreover, amusement devices, unlike the machines involved here, contain no knock-off mechanism and each game won must be played off separately to return the machine to zero.

In the recent case of Szybski v. United States, 220 F.Supp. 806 (E.D.Wisc. 1963), the Court in considering this feature stated:

> "In addition, the number of free games obtainable was so great that to assume that they were the sole reward for proficiency on the machines would have been unrealistic. It was far more reasonable to assume that free games won but not played were redeemable in cash, since players leaving the machines without having played all the free games they had won would be abandoning something of value."

This is the assumption and conclusion we make here.

This feature, in conjunction with the fact that these machines had knock-off circuits operable at the time of the confiscation; that they had buttons that could be used to release free plays, and the fact that both contained two bolts similarly placed and spaced which would "knock-off" the machine if proper contact was made, leads inescapably to the conclusion that they were designed and constructed in such a way that they might entitle the person playing them to receive some cash, premiums, merchandise or tokens. The machine itself is designed to conduct or control a gambling transaction with its patrons.

The Government's expert, Mr. Neyens, was questioned about the coin divider in the machine and testified that in his opinion the purpose of the coin divider was "to divide the money in such a ratio so the storekeeper can pay off to the player the amount of money the player has coming." He stated that a coin divider is a substitute for a meter to record the number of games knocked off. However, Mr. Edward Drouse, one of Mr. Brozzetti's employees who installed and serviced the machines, testified that the coin dividers "were on the machines when we bought them, but we never used them." He said that he personally blocked the dividers on these two machines by the insertion of a wad of paper and that this made the dividers inoperable. There is nothing in the record that would warrant disbelief of this contention. Thus, although the coin dividers may normally satisfy the functions suggested by the Government, since they were inoperable here, their physical presence is of little consequence and, as a result, was not considered in the determination of the questions involved here.

The claimants attempt to explain away the bolts on the side of the machines by testimony that people playing the machines drill holes in the side of the machines and insert wires to trip the scoring mechanisms and thereby win free games in that manner. Claimants contend that the bolts were merely inserted to block up holes so drilled by a player. If persons are willing to drill holes into machines of this type in order to win free games and the mechanism must be protected by metal plates, the Government contends, and properly so, that this is evidence that the machines are gambling devices. No one is apt to perform an elaborate drilling operation to operate a five-cent amusement machine free, whereas, if cash payoffs are being given, a strong incentive to beat the machine is easily understandable.

From a consideration of all the evidence presented and based on the arguments presented by both sides, it is my conclusion that the features, characteristics and functions of these machines are such that they may deliver or entitle the players to receive cash, premiums, merchandise or tokens. Thus they are gambling devices as defined by 26 U.S.C. § 4462(a) (2) (A), and since the tax imposed on gambling devices by 26 U.S.C. § 4461(a) (2), has not been paid, they are properly condemned and forfeited to the United States pursuant to 26 U.S.C. § 7302.

█ It would seem now that the only question left to be answered is whether the machines were illegally seized and, if so, whether this would have any effect on their forfeiture. Under the holding of the United States Court of Appeals for the Third Circuit in United States v. Plymouth Coupe, 182 F.2d 180 (1950), there might have been some problem. However, on October 7, 1963, the Third Circuit expressly overruled the Plymouth Coupe case in United States v. $1,058.00 in United States Currency, Nathan Granoff, Claimant, 323 F.2d 211 (3d Cir. 1963), where it was held that "Contraband, although unlawfully seized, may nevertheless be forfeited." In so holding, the Circuit Court quoted the doctrine pronounced in the case of the United States v. One Ford Coupe, 272 U.S. 321, 47 S.Ct. 154, 71 L.Ed. 279 (1926), where the Supreme Court, in addressing itself to an analogous question, stated:

> "It is settled that where property declared by a federal statute to be forfeited because used in violation of federal law is seized by one having no authority to do so, the United States may adopt the seizure with the same effect as if it had originally been made by one duly authorized."

The overwhelming weight of authority in the Circuits holds that a warrant is unnecessary in the enforcement of an action for forfeiture. See, e. g., Interbartolo v. United States, 303 F.2d 34 (1st Cir. 1962); United States v. Carey, 272 F.2d 492 (5th Cir. 1959); United States v. One 1956 Ford Tudor Sedan, 253 F.2d 725 (4th Cir. 1958); Sanders v. United States, 201 F.2d 158 (5th Cir. 1953); United States v. Pacific Finance Corporation, 110 F.2d 732 (2d Cir. 1940); Bourke v. United States, 44 F.2d 371 (6th Cir. 1920). These cases are but a sampling, Circuit by Circuit, of many others to the same effect.

Accordingly, having concluded that the machines involved herein are gaming devices subject to seizure and forfeiture, the relief prayed for by the Government will be granted.