**UNITED STATES of America**

**v.**

**THREE (3) TRADE BOOSTERS: Subassembly and Essential Part of a Gambling Device.**

**Civ. A. No. 5097.**

United States District Court
M. D. Pennsylvania.

Oct. 18, 1955.

J. Julius Levy, U. S. Atty., Edwin M. Kosik, Asst. U. S. Atty., Scranton, Pa., for plaintiff.

Charles W. Kalp, Samuel S. Brown, Lewisburg, Pa., for defendant.

WATSON, District Judge.

The United States of America filed a Libel of Information praying for the seizure and condemnation of three Trade Boosters under the provisions of Public Law 906, 81st Congress, 2nd Session, Sec. 7; 15 U.S.C.A. § 1177.[1] The Trade Boosters were seized at Williamsport, Pennsylvania, by Agents of the Federal Bureau of Investigation acting under authority of the Attorney General.

Frank J. Zaydell, of Williamsport, Pennsylvania, answered the Libel of Information alleging ownership of the machines. Claimant Zaydell alleged that the Trade Booster devices were not gambling devices as defined in 15 U.S.C.A. §§ 1171–1177, and more specifically, 15 U.S.C.A. § 1171(a) (1), (a) (2), (a) (3) and § 1172,[2] and requested that the Warrant of Seizure and Monition heretofore issued in this case be quashed; and prayed that the Three (3) Trade Boosters, the subject of said warrant, be returned to claimant, Frank J. Zaydell. The request that the Warrant of Seizure and Monition be quashed was subsequently withdrawn. The case was tried before this Court without a jury. From the evidence and the stipulation filed by counsel, the Court makes the following

Findings of Fact ·

1. The Trade Booster devices were designed and built by the H. C. Evans Company, Chicago, Illinois, for Taylor and Company, Chicago, Illinois.

2. The Three (3) Trade Boosters were introduced into interstate commerce in Chicago, Illinois, and were transported from Chicago to Williamsport, Pennsylvania.

3. The Three (3) Trade Boosters were purchased by Frank J. Zaydell, Claimant; and shipped by Taylor and Company from Chicago, Illinois, to claimant's place of business in Williamsport, Pennsylvania.

4. H. C. Evans Company was registered with the Attorney General under

---

1. Sec. 1177 provides: "Any gambling device transported, delivered, shipped, manufactured, reconditioned, repaired, sold, disposed of, received, possessed; or used in violation of the provisions of this chapter shall be seized and forfeited to the United States * * * That such duties with respect to seizures and for-
feitures * * * shall be performed * * * by such officers, agents, or other persons as may be authorized or designated for that purpose by the Attorney General. Jan. 2, 1951, c. 1194, § 7, 64 Stat. .1135". ·

2. Sec. 1171—Definitions—"As used in this chapter—(a) The term 'gambling device'

Public Law 906. as a manufacturer and dealer in gambling devices.[3]

5. The Trade Boosters are electrically operated devices, and each consists of a steel cabinet, containing various electrical circuits. There are also three meters inside each cabinet, the function of which is to register the number of games played, the number of games won and the number of "jackpots" won.

6. The Trade Boosters permitted slot machines to be operated by remote control after the slot machines had been altered by having the coin slots and certain other parts removed.

7. Trade Boosters numebered B–211, B–114, and B–203 were sold by Frank J. Zaydell to the Wheel Inn in Roaring Branch, Pennsylvania. These Trade Boosters were used to operate slot machines from which the coin slots and certain other parts had been removed.

8. The operation of the Trade Boosters was explained by the partner and office manager of the Taylor Company to an agent of the Federal Bureau of Investigation. He explained " * * * that

after a Trade Booster was shipped to the consignee or customer that electrical connections were made between the Trade Booster and the slot machine, after the payout equipment was removed from the slot machine; that after it was placed on location the owner would designate it either a five cent play, ten cent play, twenty-five cent play, or fifty cent play; that when a customer approached the machine he would inquire of the bartender as to what play it was. He illustrated in this fashion, that if it was a ten cent play machine the customer would pay the bartender one dollar, at which time the bartender would press a button which would register ten plays on the cabinet control box located at the bar as well as the register located at the slot machine where the jackpot is ordinarily located, and if the customer pulled the lever or handle on the machine, the plays would either be depleted or added to if the customer had a winner, and if the customer had a winner he would be paid in free games or the amount in cash, and he illustrated that if he was ten games ahead he would be paid one dollar. He

means—(1) any so-called 'slot machine' or any other machine or mechanical device an essential part of which is a drum or reel with insignia thereon, and (A) which when operated may deliver, as the result of the application of an element of chance, any money or property, or (B) by the operation of which a person may become entitled to receive, as the result of the application of an element of chance, any money or property; or (2) any machine or mechanical device designed and manufactured to operate by means of insertion of a coin, token, or similar object and designed and manufactured so that when operated it may deliver, as the result of the application of an element of chance, any money or property; or (3) any subassembly or essential part intended to be used in connection with any such machine or mechanical device. * * * Jan. 2, 1951, c. 1194, § 1, 64 Stat. 1134".

Sec. 1172 provides that: "It shall be unlawful knowingly to transport any gambling device to any place in a State, the District of Columbia, or a possession of the United States from any place outside of such State, the District of Columbia, or possession: Provided, that this

section shall not apply to transportation of any gambling device to a place in any State which has enacted a law providing for the exemption of such State from the provisions of this section, or to a place in any subdivision of a State if the State in which such subdivision is located has enacted a law providing for the exemption of such subdivision from the provisions of this section. * * * Jan. 2, 1951, c. 1194, § 2, 64 Stat. 1134".

3. 15 U.S.C.A. § 1173 provides: "Upon first engaging in business, and thereafter on or before the 1st day of July of each year, every manufacturer of and dealer in gambling devices shall register with the Attorney General his name or trade name, the address of his principal place of business, and the addresses of his places of business in such district. On or before the last day of each month every manufacturer of and dealer in gambling devices shall file with the Attorney General an inventory and record of all sales and deliveries of gambling devices as of the close of the preceding calendar month for the place or places of business in the district. The monthly record of sales and deliveries of such gambling devices shall show the mark and number identifying

explained that the pay-out mechanism was removed from the machine, that the coin insert was plugged off, and also the pay-out was plugged off from the front—from the casting on the front of the slot machine."

9. The advertising and descriptive literature received by Zaydell from the Taylor Company referred only to the attachment of a Trade Booster to a slot machine.

10. Slot machines to which Trade Boosters were attached were used for gambling purposes at the Wheel Inn at Roaring Branch, Pennsylvania.

11. The Trade Boosters were designed and manufactured for the purpose of permitting the operation of slot gambling machines from which the coin slots and certain other parts had been removed.

12. The Trade Booster is essential to the operation of the slot machine in the said altered condition.

13. Winning combinations on the machines resulted solely from the application of an element of chance, and winnings recorded on the machines installed in the Wheel Inn, Roaring Branch, Pennsylvania, were paid off in cash.

14. Frank J. Zaydell made no sales of Trade Boosters for any purpose other than that of attaching them to altered slot machines.

### Discussion

The machines to which the Trade Boosters were designed to be attached were slot machines before being altered, and as such, were clearly gambling de-

vices. These slot machines were modified or altered by removing the apparatus which allowed them to be operated by inserting a coin in the proper receptacle or "slot". The tubes which delivered winnings were also removed.

██ A slot machine is not a gambling device merely because it has slots—it is a gambling device because it is designed and manufactured to be used as such. A device manufactured and designed to be used as a gambling device continues to be a gambling device within the contemplation of the law even though, *in fact*, the device is never used for gambling purposes.

██ Therefore, we are confronted with the question whether the character of a device changes from that of a gambling device to that of a nongambling device after it has been altered by removing from it those features which permit it to be operated by the insertion of a coin, and replacing such features with a device which allows it to be operated in some other manner. The Court believes not.

The function of the Trade Booster is to permit the operation of the altered slot machine by remote control, and to the extent to which coins and coin slots were essential to the operation of the device prior to its alteration the Trade Booster is essential to its operation in its present state. The use for which the slot machine was originally designed and manufactured has not been changed in any manner by the alterations made to the device. The Court is aware that the

each article together with the name and address of the buyer or consignee thereof and the name and address of the carrier. Duplicate bills or invoices, if complete in the foregoing respects, may be used in filing the record of sales and deliveries. For the purposes of this chapter, every manufacturer or dealer shall mark and number each gambling device so that it is individually identifiable. In cases of sale, delivery, or shipment of gambling devices in unassembled form, the manufacturer or dealer shall separately mark and number the components of each gambling device with a common mark and

number as if it were an assembled gambling device. It shall be unlawful for any manufacturer or dealer to sell, deliver, or ship any gambling device which is not marked and numbered for identification as herein provided; and it shall be unlawful for any manufacturer or dealer to manufacture, recondition, repair, sell, deliver, or ship any gambling device without having registered as required by this section, or without filing monthly the required inventories and records of sales and deliveries. Jan. 2, 1951, c. 1194, § 3, 64 Stat. 1135."

slot machines to which the Trade Boosters were attached are not involved in this action. We are here concerned with the Trade Boosters in their role as subassemblies or essential parts of slot machines, designed and manufactured with the intent that they be used in connection with slot machines.

Claimant argues that because the Trade Booster might be used in connection with the operation of other devices that this fact removes them from the category of gambling device subassemblies. The advertising literature which the Taylor Company used in the promotion of the sale of Trade Boosters refutes this argument. The descriptive literature is devoted almost exclusively to the use of the Trade Boosters in combination with altered slot machines. The Court is convinced that such use motivated the manufacturer in the design and manufacture of the Trade Booster devices.

An unaltered slot machine is coin-operated and in that condition the coin slots and pay-out tubes, so called, are essential to its operation. In this action, we find that a Trade Booster device performs precisely the same function as the coin slots performed. Without the Trade Booster the altered slot machines cannot be operated.

The Trade Booster became an essential part or subassembly of the slot machine in its altered form. It was the Trade Booster which made the altered slot machine operative, and for that reason, by virtue of the language of 15 U.S.C.A. § 1171(a) (3), it became a gambling device, the interstate shipment of which was a violation of the statute.

The Court concludes that the Trade Booster is a gambling device as defined in 15 U.S.C.A. § 1171(a) (3). The testimony and exhibits introduced at the trial support no other conclusion.

### Conclusions of Law

1. That the slot machines to which the Trade Boosters were attached were gambling devices as defined in 15 U.S. C.A. § 1171(a) (2), by virtue of having been designed and manufactured to operate by means of insertion of a coin, or token, or similar object and designed and manufactured so that when operated they might deliver, as a result of the application of an element of chance, money or property. United States v. 24 Digger, etc., 8 Cir., 1953, 202 F.2d 647.

2. The Trade Booster devices involved in the instant proceedings are gambling devices as defined by 15 U.S.C.A. § 1171 (a) (3) in that they are subassemblies and essential parts of the gambling devices to which they were attached and of which they formed a part.

3. The Trade Boosters involved in this action, Serial Nos. B–211, B–306 and B–317, are gambling devices as defined in Title 15 U.S.C.A. § 1171(a) (3) and by virtue of having been transported in interstate commerce from Chicago, Illinois, to Williamsport, Pennsylvania, violate the provisions of Title 15 U.S.C.A. § 1172.

4. The request and prayer of Claimant Frank J. Zaydell contained in his answer will be denied.

5. The said Trade Boosters, Serial Nos. B–211, B–306 and B–317, will be forfeited to the United States of America for disposition as provided by Title 19 U.S.C.A. § 1611.

An appropriate order will be entered herewith.