UNITED STATES of America

v.

294 VARIOUS GAMBLING DEVICES.

Civ. A. No. 85–297 Erie.

United States District Court,
W.D. Pennsylvania.

July 20, 1989.

James J. Ross, Asst. U.S. Atty., Erie, Pa., for U.S.

John L. Doherty, Manifesto & Doherty, P.C., Pittsburgh, Pa., for Mickey Anderson, Inc.

Roger H. Taft, MacDonald Illig Jones & Britton, Erie, Pa., for Warners Coin, Heritage Vending & Erie Vending.

William F. Scarpitti, Jr., Bifulco Waidley Scarpitti & Assoc., Erie, Pa., for Andrew DiVecchio & Gold Crown Billiards.

Robert J. Cindrich, Bruce A. Antkowiak, Mansmann Cindrich & Huber, Pittsburgh, Pa., for Warner's Coin, Heritage Vending, & Erie Vending Machine.

Robert C. Brabender, Erie, Pa., for Erie Coin Vending.

Sumner E. Nichols, II, Dunlavey Nichols Ward & Krill, Erie, Pa., for Blackie's a/k/a Leonard Kaye.

Bradley H. Foulk, Erie, Pa., for Romeo Amusement.

## OPINION

GERALD J. WEBER, District Judge.

The U.S. instituted this civil forfeiture action against a variety of video draw poker machines, alleging that they are gambling devices prohibited by 15 U.S.C. § 1171 *et seq.* The machines were seized by agents of the FBI from various bars, restaurants and clubs throughout Erie County, Pennsylvania, and from the warehouses of several local distributors.

Several claimants have come forward, asserting ownership of the various seized machines. These claimants contend that their machines are not gambling devices within the meaning of the federal statute, but are in fact intended "for amusement purposes only."

The government has filed a wide-ranging motion for summary judgment with voluminous briefs, an expert's report and deposition transcript, and various and sundry affidavits and exhibits. Not to be outdone, the claimants have filed separate and often repetitive briefs, several reports and a deposition transcript from claimants' expert, and other evidentiary material. Several claimants joined in a cross motion for summary judgment. Even a video industry association has joined the fray as amicus curiae, adding little of consequence. Both sides engage in hyperbole and self righteous rhetoric. The result is a large, complex, poorly organized and often redundant pile of information and argument which we have had the misfortune of reading and re-reading in an effort to resolve this matter. Despite the sheer volume of material, the evidence of record on some matters is so woefully inadequate as to prevent resolution in favor of either side.

## I. DEFAULTED MACHINES

A number of the seized machines went unclaimed and the government subsequently moved for a default judgment which this Court granted. Shortly thereafter, claimant Leonard Kaye d/b/a Blackie's Amusement filed an objection to the motion for default and sought to amend its claim to include four of the defaulted machines.

This claim is clearly out of time. We earlier granted Kaye one opportunity to file a claim nunc pro tunc and Kaye did not include these four machines. Despite having had ample time to investigate his interests in the various unclaimed machines, and despite having been granted leave to file one untimely claim, Kaye did nothing until the government finally moved for default. Kaye now asks our indulgence a second time, but repetitive dilatory conduct will not be rewarded. Claimant offers no reason for his failure to make a timely claim, and so his objection to the entry of default judgment as to machines No. 9, 10, 127 and 128 is denied.

## II. VIDEO POKER MACHINES

### FACTS

Almost all of the 294 devices may be characterized as video draw poker machines. Although individual machines may vary in name, design or special features, all depict a video game of draw poker, with the exception of several Blackjack machines and one reel-type slot machine which we will discuss later in this Opinion.

The video incarnation of draw poker is a rudimentary game. The machine displays the time honored ranking of poker hands and the number of points the machine will award for the listed hands. The ranking of hands is grounded in laws of statistical probability, and the video draw poker machine awards points based on this scale, although it does not award true odds. The higher the rank of the hand, the higher the amount of points awarded. Of course the machine does not award points for all hands. Ordinarily the machine awards points for a pair of Aces and higher ranking hands, but does not award points for lower ranking hands, e.g., a pair of sevens.[1]

The actual play of a game of video poker is extraordinarily simple, requiring an average of 5 to 15 seconds. Upon insertion of a quarter, the machine displays five cards on a video screen. These five cards are randomly selected by the machine from an ordinary deck of 52 cards in four suits. In an effort to improve the hand dealt to him, the player may then "discard" any of the five original cards by pressing the appropriate buttons on the machine. The machine then displays new cards to replace the ones discarded. The machine automatically evaluates this final array of five cards, ranks it as a poker hand, and awards points as indicated above.

This in all its simplicity is the sum total of the game of video poker. The object of the game is to obtain the best possible poker hand with a ranking of "a pair of Aces" or better. The machine automatically awards points for the various ranks of poker hands, with the greatest reward naturally coming for the rarest hands. Unlike an ordinary poker game, the video version has no raising, no bluffing, no money management skills. Indeed the player has no opponent. He plays only against a set schedule of point awards.

Up to now we have employed the term "points" to describe the units awarded to the player by the machine for winning poker hands. No matter whether an individual machine labels it "score," "credits," or "games," each point entitles the player to one free play of the machine. Each play of the game has one object: the accumulation of additional free games, and these free games may be accumulated from game to game so that, with a run of luck, a player may accumulate a significant number of free games.

When a machine is used as a gambling device, these free games are converted to cash by a bartender or owner of the establishment that houses the machine. A successful player in such an establishment is paid a quarter for each "credit" accumulated on the machine. The bartender or owner, having verified the number of credits and paid the player, then removes or "knocks off" the player's accumulated

---

**1.** The minimum winning hand may vary at the owner's option. For example, some machines award points for a pair of Jacks or better.

credits, returning the machine to zero credits to await the next player's coins.

Several of the seized machines employ images of dwarfs, or dominoes or other figures instead of an ordinary deck of cards. Although these machines assiduously avoid using the term "poker," they function just as the typical video poker machines described above. The mere substitution of video images does not change the functional characteristics of the machine. Thus, such machines as "Dwarf's Den" and "Roman Tallies" are properly classed for our purposes as video poker machines.

In the course of this litigation, the government's expert sorted the subject machines into 5 Categories, as follows:

1. Devices that were fully operational and contained knockoff meters and switches. (71 machines).
2. Devices that were fully operational and contained knockoff switches and provisions for knockoff meters. (57 machines).
3. Devices that were fully operational and contained provisions for knockoff switches and meters. (102 machines).
4. Devices that were not operational but contained knockoff meters and switches or provisions for knockoff meters and switches. (22 machines).
5. Devices which were not operational, different stages of disassembly, but may contain knockoff meters and switches or provisions for knockoff switches and meters. (42 machines).

While the parties have argued over whether particular machines belong in one category or another, both sides have employed these categories in their motions and briefs.

## DISCUSSION

The government has alleged that the subject machines violate the Gambling Devices Act of 1962, 15 U.S.C. § 1171 et seq. in several respects and are therefore subject to forfeiture under § 1177 of that Chapter.

## A. SUMMARY JUDGMENT

■ We are of course mindful of the distribution of the burden of proof under this statute. The government has the burden of establishing probable cause to believe that the subject articles are gambling devices as described in the Act. The claimants then have the burden of proving by a preponderance of the evidence that the various items are not subject to forfeiture. *U.S. v. 137 Draw Poker–Type Machines*, 606 F.Supp. 747, 751 (N.D.Ohio 1984), aff'd 765 F.2d 147 (6th Cir.1985).[2] When the material facts are undisputed, resolution by summary judgment may well be appropriate. *Id.*, 606 F.Supp. at 749–750; *U.S. v. Various Slot Machines on Guam*, 658 F.2d 697, 699–700 (9th Cir.1981).

■ Claimants have argued strenuously that summary judgment is not appropriate in the present case because claimants' expert contradicts the opinions of the government's expert. Claimants argue that this battle of the experts must be waged before a factfinder at trial.

We have carefully reviewed the reports and deposition of claimants' expert and we find nothing which will preclude summary judgment. The primary facts—the nature of the game, the presence or absence of particular features—are virtually undisputed. Moreover, claimants' expert not only contradicts the government's expert but established law as well. For example, claimants' expert states that, in his opinion, no machine is a gambling device absent evidence of actual payoffs. (Snyder depo. at pp. 110–111, 114, 116–117, 120, 168; Warner Coin's brief at p. 25.) This is clearly contrary to established law as we will see below. Mere gainsaying by an expert, contrary to law and unsupported by fact, will not avoid summary judgment where otherwise appropriate. See, *U.S. v. Various Slot Machines on Guam*, 658 F.2d 697, 700–701 (9th Cir.1981), quoting *Merit Motors v. Chrysler Corp.*, 569 F.2d 666, 672–

2. Because the captions of many cases in this area are so similar, we will generally forego short form citation in an effort to prevent confusion.

673 (D.C.Cir.1977). Likewise, where the facts are undisputed, arguments over the law will not preclude summary judgment. Much of the expert opinion in this case is merely legal argument better left to counsel.

## B. DEFINITION

The statute defines "gambling device" at § 1171:

As used in this chapter—

(a) the term "gambling device" means—

(1) any so-called "slot machine" or any other machine or mechanical device an essential part of which is a drum or reel with insignia thereon, and (A) which when operated may deliver, as the result of the application of an element of chance, any money or property, or (B) by the operation of which a person may become entitled to receive, as the result of the application of an element of chance, any money or property; or

(2) any other machine or mechanical device (including, but not limited to, roulette wheels and similar devices) designed and manufactured primarily for use in connection with gambling, and (A) which when operated may deliver, as the result of the application of an element of chance, any money or property, or (B) by the operation of which a person may become entitled to receive, as the result of the application of an element of chance, any money or property; or

(3) any subassembly or essential part intended to be used in connection with any such machine or mechanical device, but which is not attached to any such machine or mechanical device as a constituent part.

The original Act of 1951, represented by § 1171(a)(1), was aimed quite specifically at slot machines, or "one-armed bandits." This caused some difficulty in enforcement, as numerous courts held the statute to be inapplicable to those acknowledged gambling devices which simply lacked the distinguishing element of a drum or reel with insignia. E.g., *U.S. v. Five Gambling Devices*, 252 F.2d 210 (7th Cir.1958); *U.S. v. Three (3) Gambling Devices, Known as Jokers*, 161 F.Supp. 5 (W.D.Pa.1957); *U.S. v. McManus*, 138 F.Supp. 164 (D.C.Wyo. 1952). The 1962 amendment of the Act added § 1171(a)(2) and reflects Congress' intention to expand the scope of the prohibition to anticipate the continuing ingenuity of gambling device designers who had developed machines which did not fit the narrow definition of § 1171(a)(1) but which nevertheless fleeced the public with equal efficiency. See, *Lion Manufacturing Corp. v. Kennedy*, 330 F.2d 833 (D.C.Cir. 1964), quoting H.R.Rep. No. 1828, 87th Cong., 2d Sess. 6, reprinted in 1962 U.S. Code Cong. & Admin.News 3809.

To this end, § 1171(a)(2) does not contain the limiting specifics of the older § 1171(a)(1). There is no single mechanical element, such as the drum or reel described in § 1171(a)(1), which denotes a gambling device. Section 1171(a)(2) does not contain such a talisman whose presence or absence may alone define the status of the device. Rather, § 1171(a)(2) commands us to consider all the attributes of a subject machine to determine whether it was "designed and manufactured primarily for use in connection with gambling."

In this context it is important to note that evidence of actual payoffs, either directly by the machine or indirectly by a bartender who redeems credits for cash, is not necessary to a determination that a machine is a gambling device. *U.S. v. One Bally "Barrel–O–Fun" Coin Operated Gaming Device*, 224 F.Supp. 794, 797 (M.D. Pa.1963), aff'd. sub nom. *Brozzetti v. Rogers*, 337 F.2d 857 (3rd Cir.1964); *U.S. v. Ansani*, 240 F.2d 216 (7th Cir.1957); *U.S. v. Various Gambling Devices*, 368 F.Supp. 661, 663 (N.D.Miss.1973); *U.S. v. One Bally County Fair Pinball Machine*, 238 F.Supp. 362 (W.D.La.1965). Indeed, a machine may, in fact, not be used for gambling at all, but if it was designed and manufactured for use in gambling, it is still a gambling device subject to forfeiture under the statute. *U.S. v. 137 Draw Poker–Type Machines*, 606 F.Supp. at 751; *U.S. v. Three (3) Trade Boosters*, 135 F.Supp. 24, 27 (M.D.Pa.1955). Thus we will examine in some detail the attributes of the subject

machines as revealed in the evidentiary material of record.

We should note at the outset that we will deal here with machines in Agent Holmes' Categories 1–4. We will consider Category 5 machines in a separate section later in this Opinion.

## C. GAME CHARACTERISTICS

 Some relevant characteristics are inherent in the game itself. In relation to most amusement games, the time to play a hand of video poker is extraordinarily short, only 5 to 15 seconds. Also, unlike most amusement games, a video poker player cannot extend the time of play regardless of the player's level of skill. For example, on pinball machines or Pacman, a player's manual dexterity, eye-hand coordination and experience may produce a longer game and greater enjoyment for the player. In video poker, each game has a finite time of play and no amount of skill or experience can extend play beyond that very short limit.

Indeed all the skill elements associated with the ordinary game of draw poker are conspicuously absent in the video version. In video poker there is no raising, no bluffing, no money management skills. The player's only skill is to recognize possible combinations and basic statistical probabilities. In this way a player can maximize his winnings in the short term but he cannot determine or influence the result. Even a player with minimal experience can discard the least desirable cards and retain those cards which provide the greatest likelihood for a winning combination, but the cards drawn are produced at random and only chance determines whether a player wins or loses. Furthermore, even this limited skill element is countered in the long run by what is called a retention ratio. Over time the video poker machine is programmed to retain a set percentage of all credits played, so that over the long haul even the astute player cannot defeat the retention ratio.

Unlike most amusement devices, video poker offers the potential to win incredibly large numbers of free games. Unlike video amusement games such as Pacman, which offer extended play, or pinball games which offer limited numbers of potential free games, all earned through skill in the play of the machine, video poker machines offer up to 400 free games for a single winning hand based solely on luck of the draw. Video poker machines also accumulate credits from game to game, permitting a player to accumulate a maximum of between 899 and 9,999 credits, depending on the setting of a particular machine. Such numbers are more than can realistically be played out (e.g., 900 free games at 10 seconds per game would translate to 2½ non-stop hours of play), and are indicative of some value other than the entitlement to a free game.

The facts described above—the short time of play, the inability to extend play, the absence of skill elements, the existence of a retention ratio, the potential for inordinate numbers of free games—are not in dispute, though claimants may argue their import. We recognize however that various courts have found such factors to be strong indicia of a gambling device. E.g., *U.S. v. 137 Draw Poker–Type Machines*, 606 F.Supp. 747 (N.D.Ohio 1984), aff'd 765 F.2d 147 (6th Cir.1985) (free games); *U.S. v. Sixteen Electronic Gambling Devices*, 603 F.Supp. 32 (D.C.Hawaii 1984) (time of play, free games, retention ratio); *U.S. v. Two Coin–Operated Pinball Machines*, 241 F.Supp. 57 (W.D.Ky.1965), aff'd sub nom. *U.S. v. H.M. Branson Distributing Co.*, 398 F.2d 929 (6th Cir.1968) (free games); *U.S. v. One Bally County Fair Pinball Machine*, 238 F.Supp. 362 (W.D.La.1965) (free games); *U.S. v. One Bally "Barrel–O–Fun" Coin–Operated Gaming Device*, 224 F.Supp. 794 (M.D.Pa.1963), aff'd sub nom. *Brozzetti v. Rogers*, 337 F.2d 857 (3rd Cir.1964) (free games, retention ration); *Szybski v. U.S.*, 220 F.Supp. 806 (E.D.Wisc.1963) (free games).

## D. PHYSICAL FEATURES

Certain physical features of most video poker machines are also relevant to our consideration. One common element is a multiple coin feature. This device permits

a player to insert more than one coin, and then wager more than one credit on a hand. For example, instead of inserting one quarter for one play of the machine as with most amusement devices, a player may insert eight quarters and wager all eight credits on one hand. In this way the player can increase his payoff, because the credits awarded for any winning combination will be multiplied by the number of credits wagered. In some machines, inserting a certain number of coins permits the player to invoke special features, such as Jokers, which may or may not improve the player's odds. In any event, multi-coin insertion and wagering allow a machine to make considerably more money in the same period of time. As stated above, such a feature is unusual in amusement devices and many courts have considered the presence of a multi-coin feature to be strong evidence that a machine was designed and intended for gambling. E.g., *U.S. v. 137 Draw Poker–Type Machines*, 606 F.Supp. 747, 753 (N.D.Ohio 1984), aff'd 765 F.2d 147 (6th Cir.1985); *U.S. v. Sixteen Electronic Gambling Devices*, 603 F.Supp. 32 (D.C.Hawaii 1984); *U.S. v. Various Gambling Devices*, 368 F.Supp. 661 (N.D.Miss. 1973); *U.S. v. One Bally "Barrel–O–Fun" Coin–Operated Gaming Device*, 224 F.Supp. 794 (M.D.Pa.1963), aff'd sub nom. *Brozzetti v. Rogers*, 337 F.2d 857 (3rd Cir. 1964). It appears that all of the subject machines were designed and manufactured with multi-coin capability, although on some machines claimants chose single coin insertion, an option permitted by the machines.

The government has suggested that another feature whose presence is indicative of gambling is a Power Interrupt Circuit (PIC). This is simply a battery pack which may prevent a machine from losing programming instructions or accounting data in the event the machine is unplugged, turned off, or otherwise loses power. The government contends that PIC's are necessary in video poker machines to prevent the loss of accounting data which facilitates payoffs. On the other hand, claimants have advanced evidence that many amusement video and pinball machines contain PIC's and that PIC's in both video poker machines and amusement devices serve perfectly legitimate functions, protecting other non-gambling data and obviating the need to reset optional features each time the machine is turned on. In light of the evidence presented, the government's argument on this point is unpersuasive, but we need not rely on that argument to determine the status of these machines.

We turn now to what some consider to be the indispensable elements of a gambling device—the knock off switch and meter. Most video poker machines are equipped with a knock off switch which permits an attendant to quickly eliminate any number of accumulated credits, returning the machine to zero credits to await the next player's coins. This device may take many forms, from a remote control, or elaborately concealed switches, to simply unplugging the machine, but in any form it serves the simple function of permitting the operator of the establishment to quickly remove large numbers of free games from the machine in a matter of seconds.

The knock off switch is often accompanied by a meter or series of meters which tell the owner of the machine how many credits have been knocked off. In some machines the mechanical meters have been supplanted by computerized accounting features programmed into the machine's circuitry.

These features facilitate the use of video poker machines for gambling. Indeed they appear to have no other function. If a successful player exchanges his accumulated credits for cash, ordinarily being paid by the bartender, the bar owner or bartender can then remove the credits from the machine. The knock off meter or other accounting device automatically records the number of credits knocked off. When the machine's owner makes his periodic stop to empty the coin box, he can read the knock off meter or other accounting device to determine how much the bar owner paid out in winnings and to reimburse him for that amount.

These features have no parallel among most amusement devices. Ordinary amusement games do not permit a player to accumulate large numbers of credits, so there is little need for a knock off switch. The knock off meter is even more obviously related to gambling. Unless a bar owner is paying cash to players for accumulated credits and is expecting reimbursement from the machine's owner, there is no purpose in counting knocked off games. Thus the presence of one or both devices is strong evidence that a player may exchange credits for cash, i.e., that the machine is intended for gambling. E.g., *U.S. v. 137 Draw Poker–Type Machines*, 606 F.Supp. 747, 753 (N.D.Ohio 1984), aff'd 765 F.2d 147 (6th Cir.1985); *U.S. v. Sixteen Electronic Gambling Devices*, 603 F.Supp. 32 (D.C. Hawaii 1984); *U.S. v. Various Slot Machines on Guam*, 658 F.2d 697 (9th Cir.1981); *U.S. v. Two Coin–Operated Pinball Machines*, 241 F.Supp. 57 (W.D.Ky. 1965), aff'd sub nom. *U.S. v. Branson Distributing Co.*, 398 F.2d 929 (6th Cir.1968).

Although in some machines the knock off switch is as obvious as a red button on the cabinet, in others it is disguised in a more or less elaborate manner. Some machines are equipped with radio remote control. Some machines are built so that a magnet passed over a particular part of the machine will cause two wires to make contact and activate the knock off function. Other machines are equipped with a "slam switch," and the cabinet must be struck to cause two terminals to make contact. On some machines, several play buttons on the front of the cabinet must be pressed in a predetermined sequence. Other machines are equipped with what appears to be two bolts projecting from the cabinet. These bolts are wired inside the cabinet and when a quarter is used to span the gap between them, the electrical circuit is completed and the knock off function activated. Computerized accounting devices may also be disguised. Some machines require the insertion of an electrical component carried by the owner to activate the display of the accounting function.

Such elaborate disguises are unusual in most amusement games. Indeed, unless credits have some monetary value, there is little reason to disguise these features. Thus the effort to disguise these features, considered in the context of other evidence, is evidence that the subject machines are gambling devices. Cf., *U.S. v. One Bally "Barrel–O–Fun" Coin–Operated Gaming Device*, 224 F.Supp. 794 (M.D.Pa.1963), aff'd sub nom. *Brozzetti v. Rogers*, 337 F.2d 857 (3rd Cir.1964).

Thus, video poker machines with their inherent characteristics (i.e., short time of play, large number of potential free games, etc.) when equipped with knock off switches and meters are indisputably gambling devices in violation of the statute. See, *U.S. v. 137 Draw Poker–Type Machines*, 606 F.Supp. 747 (N.D.Ohio 1984), aff'd 765 F.2d 147 (6th Cir.1985); *U.S. v. Sixteen Electronic Gambling Devices*, 603 F.Supp. 32 (D.C.Hawaii 1984). However, not all the machines seized in this case are equipped with knock off switches and meters. Defendants argue quite strenuously that without knock off switches and meters, the government must present evidence of actual payoffs on each machine to prove it is a gambling device.

We disagree. To accord such determinative weight to knock off switches and meters would be reverting to the talismanic approach specifically disavowed in the passage of the 1962 amendment of the Act. As discussed above, we must consider all relevant characteristics and features of the machines to determine whether they were "designed and manufactured primarily for use in connection with gambling." 18 U.S.C. § 1171(a)(2).

Several courts have held that the absence of such components is not determinative. In *U.S. v. One Bally "Barrel–O–Fun" Coin–Operated Gaming Device*, 224 F.Supp. 794, 798 (M.D.Pa.1963), aff'd sub nom. *Brozzetti v. Rogers*, 337 F.2d 857 (3rd Cir.1964), the District Court stated:

> Although these machines have no meters for recording the free plays released, a meter is not essential for the carrying on of the gambling operation. It is merely a measure employed by the owner for his

protection, keeping a check on the amount the proprietor had to pay out in cash, premiums or tokens.

See also, *U.S. v. Sixteen Electronic Gambling Devices*, 603 F.Supp. 32 (D.C.Hawaii 1984).

Defendants point out that most machines do not contain knock off switches and meters when manufactured. Addition of such devices is a local option, ordinarily performed by the owner. Accordingly, defendants argue that video poker machines when manufactured are legal. It is only when these machines are altered by local owners to facilitate gambling that they offend the statute.

But it is also clear from the evidence that knock off switches and meters could not be added unless the circuitry and programming of the machine by the manufacturer contained provisions for these features. Indeed claimants' expert admits this. (Snyder depo. at 98–102.) The government has established that all the subject machines, with the exception of several substantially disassembled ones, contain either knock off switches, knock off meters, or the provisions in programming and circuitry to accomodate the swift addition of such features.

Just as knock off switches and meters have little purpose other than to facilitate use of the machine for gambling, there is likewise no legitimate purpose in designing and manufacturing a machine to accomodate such features. Other courts have addressed this question and have agreed. *U.S. v. Sixteen Electronic Gambling Devices*, 603 F.Supp. 32 (D.C.Hawaii 1984); *U.S. v. One Bally "Barrel–O–Fun" Coin–Operated Gaming Devices*, 224 F.Supp. 794 (M.D.Pa.1963), aff'd sub nom. *Brozzetti v. Rogers*, 337 F.2d 857 (3rd Cir.1964); *U.S. v. H.M. Branson Distributing Co.*, 398 F.2d 929, 943 (6th Cir.1968); but see *U.S. v. Various Slot Machines on Guam*, 658 F.2d 697, 703–704 (9th Cir.1981) (Byrne, Jr., D.J. dissenting). See also, *U.S. v. Ansani*, 240 F.2d 216 (7th Cir.1957) (manufacturer cannot permit owner to accomplish by indirection what manufacturer cannot legally accomplish directly). We therefore conclude that all subject video poker machines with knock off switches and meters, *or the provision* in wiring, circuitry or programming to accomodate the addition of knock off switches and meters, are gambling devices within the meaning of the Act.

### E. PENNSYLVANIA LAW

■ "Foul!" cry the claimants as they gesture frenziedly in the direction of *Commonwealth v. Two Electronic Poker Game Machines*, 502 Pa. 186, 465 A.2d 973 (1983). As claimants interpret this decision, video poker machines are legal in Pennsylvania absent knock off switches and meters or evidence of actual payoffs. Furthermore, claimants allege that in response to the Supreme Court's decision, claimants reached an agreement with the District Attorney for Erie County at that time. Claimants promised to disconnect knock off switches and meters and the District Attorney agreed not to prosecute claimants or seize their machines. Claimants argue that our holding today is contrary to the decision of the Pennsylvania Supreme Court and deprives them of their bargain with the District Attorney.

First of all, it appears that claimants were less than forthright with the District Attorney since nearly half of the machines seized still had functioning knock off switches in violation of the alleged agreement, and nearly a fourth had both knock off switches and meters.

But in any event, the decision of the Pennsylvania Supreme Court is not binding on us in this instance. The Court was interpreting a state statute, 18 Pa.C.S.A. § 5513. We are dealing with a federal statute with a legislative and judicial history of its own. Under the Pennsylvania statute, the critical factor "is the actual condition of the machine at the time it is confiscated which controls when no evidence of gambling activity is introduced." *Commonwealth v. Twelve Dodge City Video Poker Machines*, 517 Pa. 363, 537 A.2d 812, 814 (1988). Under the federal statute, the critical issue is whether the machine was *"designed and manufactured* primarily for use in connection with gambling."

Under the state statute, "the *potential* for a reward does not satisfy the Commonwealth's burden of proof." *Id.* (emphasis in original). Under the federal statute, a gambling device is a machine "by the operation of which a person *may become entitled* to receive ... any money or property." 15 U.S.C. § 1171(a)(2)(B) (emphasis added).

[8] Claimants correctly point out that the federal statute was intended to supplement state enforcement efforts, not supplant them, and it was not intended to prohibit machines which a state held to be legal. However, the federal statute requires states to affirmatively and specifically exempt machines from the federal prohibition. 15 U.S.C. § 1172. The exemption may not be inferred or implied, but must be stated expressly, with reference to the federal statute. *U.S. v. Two Hollycrane Slot Machines,* 136 F.Supp. 550 (D.C.Mass.1955); *U.S. v. 46 Gambling Devices,* 138 F.Supp. 896 (D.C.Md.1956), aff'd sub nom., *North Beach Amusement Co. v. U.S.,* 240 F.2d 729 (4th Cir.1957).

Pennsylvania's statute does not do this. In fact it does not purport to exempt gambling machines but rather to prohibit them. The Pennsylvania Supreme Court has simply decided what minimum quantum of evidence is required to denominate a machine as illegal per se under a state statute without evidence of actual gambling activity. The state statute does not refer to the federal statute, and as seen above, it is couched in very different terms. Indeed it is unlikely that the state statute, which defines a machine by its status at time of seizure, could mesh in any meaningful way with a federal statute which focuses on design and manufacture. For the reasons stated, we conclude that neither the state statute, 18 Pa.C.S.A. 5513(b), nor the decision in *Commonwealth v. Two Electronic Poker Game Machines,* 502 Pa. 186, 465 A.2d 973, creates an exemption within the meaning of the federal statute.

However, even if Pennsylvania law created an exemption, the subject machines might still be forfeited for failure to register. A state exemption of a machine which otherwise satisfies the federal statutory definition of a gambling device does *not* exempt the owner or the machine from the registration requirements of § 1173. *U.S. v. Various Gambling Devices,* 368 F.Supp. 661, 663–664 (N.D.Miss.1973). We address the issue of registration a little later in this Opinion.

■ As for claimants' partial efforts to sanitize their machines under agreement with the District Attorney, such efforts have no effect under the federal statute. Altering or removing features may not affect the status of the machine. For example, in *U.S. v. Ansani,* 240 F.2d 216 (7th Cir.1957), machines were altered to remove the coin slots and payout trays:

A slot machine is not a gambling device merely because it has coin slots or an automatic pay off mechanism. It is a gambling device because its function and design are to allow one to stake money or any other thing of value upon the uncertain event of achieving the winning combination of insignia. Essentially the game is played as it was before the alteration or modification; and we cannot believe that a player would classify the machine differently after the conversion.

*Id.,* 240 F.2d at 220. See also, *U.S. v. 137 Draw Poker–Type Machines,* 606 F.Supp. 747 (N.D.Ohio 1984), aff'd 765 F.2d 147 (6th Cir.1985); *U.S. v. 24 Digger Merchandising Machines,* 202 F.2d 647 (8th Cir.1953); *U.S. v. Three (3) Trade Boosters,* 135 F.Supp. 24 (M.D.Pa.1955). The same is true in the present case. The simple deletion of knock off switches and meters or the elimination of multi-coin features may not sanitize a machine when facts make clear that it was designed primarily to facilitate function as a gambling device. Certainly the player approaches the game no differently just because its internal accounting feature is disconnected. As stated above, the key to the inquiry under the federal statute is the design and manufacture of the machine. Each of the operative machines seized by the government was designed and manufactured so that it would easily accomodate multi-coin features or the addition of knock off switches and meters.

## F. GOOD FAITH

Finally, claimants' counsel have beat their collective breasts and shouted from the mountain that their clients are innocent, hard-working businessmen who never intended or envisioned the use of their machines for such illicit purposes as (gasp!) *gambling*. While we sincerely doubt the verity of such remonstrations, they are in any event irrelevant. Good faith is not a defense to in rem forfeiture under the Act. *U.S. v. 137 Draw Poker–Type Machines*, 606 F.Supp. 747, 755 (N.D. Ohio 1984) and cases cited therein. If St. Peter possessed a gambling device, it would be forfeited, though effecting seizure might be difficult.

## G. FREE GAMES AS PROPERTY

In reaching our conclusion that the subject machines are gambling devices within the meaning of § 1171(a)(2), we note that we have not relied on the government's contention that a free game is itself a reward of property received as a result of chance, making the machine a gambling device and eliminating any need for direct or circumstantial evidence of payoffs. Although courts have differed as to whether free games are property, we view the government's argument with some skepticism. The evil of such machines does not lie in the lure of free replays, but in the implicit promise of a cash reward in lieu of those replays. Although each free game has the value of a quarter to a player because it excuses him from spending a quarter to play the game, if the player simply plays out all his credits, he has only won amusement. This is not uncommon in amusement games and in this sense, free games are no different than extended play on Pacman or free replays on pinball machines. Indeed the legislative history of the Act indicates that limited free games are not sufficient reward to make a machine a gambling device. See, *Lion Manufacturing Corp. v. Kennedy*, 330 F.2d 833, 836 (D.C.Cir.1964), quoting H.R.Rep. No.

1828, 87th Cong., 2d Sess. 6, reprinted in 1962 U.S.Code Cong. & Admin.News 3809. The mere fact that a machine awards free games is proof of nothing. Whereas here the potential number of free games is large, where play is short and skill plays little part, then a machine begins to exhibit the indicia of a gambling device. Whether such indicia, absent evidence of knock off switches and meters or the provisions for such devices, are sufficient to sustain a finding that a machine is a gambling device is an issue we need not decide today. Accord, *U.S. v. 137 Draw Poker–Type Machines*, 606 F.Supp. 747, 754 n. 9 (N.D.Ohio 1984), aff'd 765 F.2d 147 (6th Cir.1985).[3]

## H. DISASSEMBLED MACHINES

We now return to Agent Holmes' 5 Categories of machines recited earlier:

1. Devices that were fully operational and contained knockoff meters and switches. (71 machines).

2. Devices that were fully operational and contained knockoff switches and provisions for knockoff meters. (57 machines).

3. Devices that were fully operational and contained provisions for knockoff switches and meters. (102 machines).

4. Devices that were not operational but contained knockoff meters and switches or provisions for knockoff meters and switches. (22 machines).

5. Devices which were not operational, different stages of disassembly, but may contain knockoff meters and switches or provisions for knockoff switches and meters. (42 machines).

For the reasons stated above, we conclude that there are no disputed issues of material fact and all video poker machines in Categories 1–4, having all the relevant inherent characteristics of the game (short time of play, little skill, retention ratio, large number of potential free games) and

---

**3.** We also note that in resolving the motions we have not relied on reports from government agents who claim to have received or observed payouts on particular machines. Much of this evidence is hearsay, without opportunity for cross examination, but it is unnecessary to our decision today.

*either* the presence of knock off switches and meters or the provisions for such devices, are gambling devices within the meaning of 15 U.S.C. § 1171(a)(2).

This brings us to Category 5, with 42 machines. This is a troubling matter. Each of these games is inoperative and most are substantially disassembled with large components missing. Some of the machines in Category 5 are little more than a box with a couple of wires. Yet it is also clear that each one of the machines in Category 5 is, or was, a video poker machine. The graphics on the cabinet, the type of buttons and their array on the face of the machine, or the internal distribution of components discloses their identity.

However, the evidence presented by both sides fails to provide enough information on each machine for us to judge which may be fairly classed as gambling devices under the Act and which may be an unrecognizable jumble of spare parts. The government has also failed to shed any light on whether any machines or parts of machines satisfy § 1171(a)(3) or whether that provision was directed solely at so-called "trade boosters." The present record and briefs on Category 5 machines are woefully inadequate on both sides and the cross motions for summary judgment must be denied, although we will not preclude additional motions properly supported.

## I. CLERICAL ERRORS

■■■ In the course of his examination of the subject machines, claimants' expert identified possible discrepancies in the exhibit numbers affixed to several machines. For example, he indicates that the machine bearing exhibit sticker No. 227 may in fact be the machine described by the government as No. 255. While such apparent discrepancies represent regrettable error by the government, they do not prevent the entry of summary judgment because the expert does not raise a material dispute as to the proper *category* assigned to the machine.

To illustrate, although claimants' expert states that No. 227 may in fact be the machine described as No. 255, he does not deny that this machine, whatever its number, contains a functioning knock off switch and meter and is therefore properly characterized as a Category 1 machine. Likewise, claimants' expert notes numerical discrepancies among several Category 5 machines, but does not suggest that these machines are anything other than Category 5 machines.

Claimants have also argued that these several discrepancies bring the government's entire numbered list into question and preclude summary judgment. We reject such an attempt at extrapolation. First of all, we have examined the evidence presented on each alleged discrepancy and find no material dispute as to the character of the involved machines. Secondly, we decline to speculate about the accuracy or inaccuracy of the rest of the list. Claimants bear the burden of presenting evidence to establish a material issue of fact. Each claimant had the opportunity to examine the seized machines. Some claimants took advantage of this opportunity. Some did not. Claimants have failed to produce any evidence of a material inaccuracy in the government's list. Absent evidentiary material to the contrary, the government is entitled to summary judgment.

In several instances, claimants' expert has no quarrel with the exhibit numbers but challenges the category assigned to particular machines by Agent Holmes. Typically claimants' expert has found a particular machine to be inoperative when Agent Holmes earlier found the machine to be functioning,[4] but claimants' expert neither denies the presence of knock off switches and meters or provisions for them, nor demonstrates the absence of such features or provisions. Although the findings of claimants' expert may justify changing the classification of a particular machine, for example from Category 1 (operative machine with knock off switch and

---

**4.** There are several possible explanations for such disagreement, including damage to a machine in transit, or the extended period in stor-

age. Because of our conclusion above, we need not consider a cause.

meter) to Category 4 (inoperative machine with such features or provisions for them) it will not preclude summary judgment because, as described above, all machines in Categories 1–4, operative and inoperative, are gambling devices under the federal statute. Thus with regard to several machines claimants' expert raises a factual dispute, but because of our conclusions above, that factual issue is not material.

## J. INTERSTATE TRANSPORT

■ Of course, the video poker machines in Categories 1–4 are not forfeited simply for being gambling devices. To be forfeited under 15 U.S.C. § 1177, the government must establish that the machines were "transported, delivered, shipped, manufactured, reconditioned, repaired, sold, disposed of, received, possessed or used in violation of" some provision of the Act. The government here alleges two violations: a) the machines were transported in interstate commerce in violation of § 1172, and b) the claimants failed to register, in violation of § 1173(a)(3).

Section 1172 makes it unlawful to "knowingly transport any gambling device to any place in a state ... from any place outside of such state ..." unless the state has created an exemption by statute. As discussed above, Pennsylvania has not created such an exemption.

There is no dispute that all the subject machines were manufactured outside of Pennsylvania and were transported to Pennsylvania in interstate commerce. However, several claimants deny being the importers and contend that the government has failed to provide evidence of a "knowing" transportation.

Scienter on the part of the owner in an in rem action is immaterial. Knowledge of the transporter, whether it be the manufacturer, the present owner, or a middleman, is sufficient to satisfy the Act. *U.S. v. 137 Draw Poker–Type Machines*, 606 F.Supp. 747, 755 (N.D.Ohio 1984), aff'd 765 F.2d 147 (6th Cir.1985); *North Beach Amusement Co. v. U.S.*, 240 F.2d 729, 732 (4th Cir.1957). As noted in the Ohio case, the only logical deduction from the facts is that the transporter, whoever it may have been, knew the machines had moved in interstate commerce. Furthermore, because the machines were designed and manufactured to facilitate gambling, and manuals and brochures accompanying the machines described these features, and the manufacturers, present owners and middlemen are sophisticated in the trade, the only logical deduction is that the transporter, whoever it may have been, knew the machines were designed and manufactured to serve as gambling devices. Claimants have not provided any evidence to the contrary other than protestations of their own ignorance. Thus there is no material issue of fact to prevent summary judgment on the issue of interstate transport.

## K. FAILURE TO REGISTER

■ Section 1173(a)(3) provides:
It shall be unlawful for any person during any calendar year to engage in the business of repairing, reconditioning, buying, selling, leasing, using, or making available for use by other any gambling device, if in such business he buys or receives any such device knowing that it has been transported in interstate or foreign commerce after the effective date of the Gambling Devices Act of 1962, unless, after November 30, of the preceding calendar year and before the date on which he buys or receives such device, such person has registered with the Attorney General under this subsection.

Claimants do not deny knowing that these machines were transported in interstate commerce after 1962. All the subject machines were manufactured in other states by manufacturers who do not have any Pennsylvania plants. There is also no doubt that claimants were in the business of leasing video poker machines or making them available for use.

Of course claimants deny knowing that the subject machines were gambling devices under the Act, and therefore claim ignorance of their obligation to register. However, each of the claimants possessed several machines which contained function-

ing knock off switches, or knock off switches and meters, and which are now the subject of this action. These machines clearly violated the Pennsylvania statute as interpreted earlier in *Commonwealth v. Two Electronic Poker Game Machines,* 502 Pa. 186, 465 A.2d 973 (1983), and these machines clearly violated the agreement the claimants reached with the Erie County District Attorney. Also, the decision in *U.S. v. 137 Draw Poker–Type Machines,* 606 F.Supp. 747 (N.D.Ohio 1984), aff'd 765 F.2d 147 (6th Cir.1985), predates the seizure of claimants' machines in this case. Thus claimants were required to register under 15 U.S.C. § 1173(a)(3), and knew or should have known of that obligation. Claimants' failure to register makes all gambling devices in their possession forfeitable under § 1177.

## III. BLACKJACK MACHINES/REEL–TYPE MACHINE

■ Not all of the seized machines depict video draw poker. Two machines depict a video version of Blackjack, and one machine appears to be a conventional reel-type slot machine.

Unfortunately, there is virtually no evidence of record concerning these machines. The government and claimants alike have focused so singlemindedly on video poker that they have ignored these other machines. The Blackjack machines may share many of the characteristics of video poker, such as short time of play, lack of skill elements, etc., but the record is silent. We do not know how the video version is played or what features the machines possess and we will not surmise. Summary judgment on the Blackjack machines must be denied.

The same is true of the one apparent reel-type slot machine. Although the government devoted three paragraphs to it in the brief, *no facts* have been provided. Does it have a reel? How is it played? Does it have a payout tray or some sort of credit meter? Clearly summary judgment is inappropriate on this item as well.

Although we must deny summary judgment for these machines on the present record, we will not preclude a renewed motion properly supported.

## IV. COINS

■ The government also seeks the forfeiture of $24,694.00 in coins taken from the subject machines. Unfortunately the government committed a serious blunder and failed to record how much money was removed from each machine. Because some of the subject machines have not been forfeited at this time, we are unable to determine on the present record how much of the cash is to be forfeited. We suspect it is unlikely that many of the Category 5 machines contained any coins, those machines being substantially disassembled and sitting in warehouses, but there is no evidence of record on this point. Of course the Blackjack machines and the one apparent reel-type slot machine have not been forfeited at this time, and because they were in functioning order in establishments where they were likely to be played, we suspect they may have had coins in them. Because the record provides no basis for us to apportion the cash between those machines which are forfeit and those which are not, summary judgment must be denied, although we will consider the issue again on a properly supported motion, either in the event that all the subject machines are forfeited, or some factual basis is provided for apportioning the cash.

## CONCLUSION

For the reasons stated, we conclude that there is no disputed issue of any material fact, and the video draw poker machines in Categories 1–4 are gambling devices within the meaning of 15 U.S.C. § 1171(a)(2) and are forfeit under § 1177 of this Chapter for violation of § 1172 and § 1173(a)(3).

We further conclude that summary judgment is inappropriate at this time as to Category 5 machines, all Blackjack machines, the one apparent reel-type slot machine, and $24,694.00 in coins, although we will entertain a renewed motion or motions

**1252**

properly supported by evidentiary material and briefs.

An appropriate Order will be entered.